George W. SHELDON, Patricia Ruth Sheldon, Merle Wallace Wingo and Betty Mae Wingo, Plaintiffs,

v.

Paul FANNIN, W. W. Dick, Richard A. Harvill, Lawrence J. Walkup, G. Homer Durham, Charles Burton, Bessie Kidd Best and Waldo M. Dicus, as Members of the State Board of Education of the State of Arizona, and Such Board, W. W. Dick, as Superintendent of Public Instruction of the State of Arizona, Frank Crosby, Vera Matthews and A. L. Penrod as Members of the Board of Trustees of Pinetop Elementary School, Pinetop, Arizona, and Such Board, Defendants.

Civ. No. 749.

United States District Court
D. Arizona,
Prescott Division.

Aug. 29, 1963.

See also, D.C., 214 F.Supp. 940.

Hayden C. Covington, Brooklyn, N. Y., Harry J. Valentine, Phoenix, Ariz., Victor V. Blackwell, Covington, La., for plaintiffs.

Robert W. Pickrell, Atty. Gen., Frank Sagarino, Asst. Atty. Gen., of Arizona, Fred O. Wilson, County Atty., of Navajo County, for defendants.

MATHES, District Judge:

This is a suit for injunctive relief, brought pursuant to the Civil Rights Act of 1871. [42 U.S.C. §§ 1983, 1985(3) and 1988.] Jurisdiction of this Court is invoked under 28 U.S.C. § 1343(3).

Plaintiffs Sheldon are the parents of Daniel Mark Sheldon. Plaintiffs Wingo are the parents of Merle William Wingo and Jere Bruce Wingo. All are Jehovah's Witnesses. These plaintiffs, suing only as parents, have no standing to sue in their own right [cf. People of State of Ill. ex rel. McCullom v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948)], since their claim based on an interest in the education of their children does not present a substantial Federal question [cf. Adler v. Board of Education, 342 U.S. 485, 502–503, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (Frankfurter J., dissenting)]. However, inasmuch as they also sue on behalf of their children, they are deemed to appear as guardians *ad litem*. For the purposes of this opinion, therefore, the children will be considered to be the plaintiffs, since they are the real parties in interest as to the claims here asserted.

It should be noted in passing that the parents also purport to bring this as a class action "for all other of Jehovah's Witnesses and their children of compulsory school age throughout the entire State of Arizona". In this respect they must fail because, as more fully appears below, the only acts as to which redress

may be obtained in this case are the acts of the local school board. That board is not threatening the other parties which plaintiffs at bar purport to represent. [See Fed.R.Civ.P. 23(a) (3), 28 U.S.C.A.]

The defendants are the Arizona State Board of Education, the individual members thereof, the Superintendent of Public Instruction of the State of Arizona, the Board of Trustees of Pinetop Elementary School, a public grade school of Pinetop, Arizona, and the individual members thereof.

The facts are without controversy, and may be briefly stated. On September 29, 1961, the plaintiffs were suspended from Pinetop Elementary School for insubordination, because of their refusal to stand for the singing of the National Anthem. This refusal to participate, even to the extent of standing, without singing, is said to have been dictated by their religious beliefs as Jehovah's Witnesses, requiring their literal acceptance of the Bible as the Word of Almighty God Jehovah. Both precedent and authority for their refusal to stand is claimed to be found in the refusal of the three Hebrew children Shadrach, Meshach and Abednego, to bow down at the sound of musical instruments playing patriotic-religious music throughout the land at the order of King Nebuchadnezzar of ancient Babylon. [Daniel 3:13–28.] For a similar reason, members of the Jehovah's Witnesses sect refuse to recite the Pledge of Allegiance to the Flag of the United States, viewing this patriotic ceremony to be the worship of a graven image. [Exodus 20:4–5.] However, by some process of reasoning we need not tarry to explore, they are willing to stand during the Pledge of Allegiance, out of respect for the Flag as a symbol of the religious freedom they enjoy. [See West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943).]

The plaintiffs were expelled from Pinetop Elementary School solely because of their refusal to stand for the National Anthem. They were not accused of any other misconduct of any kind, and were in no scholastic difficulty. They have since continued their education at home, and are therefore subject to a charge of truancy and delinquency under Arizona law for failing to attend school until they have passed the compulsory education age. Their parents too face possible prosecution for a violation of Arizona's school laws.

For these reasons and because they have not the financial means to obtain an adequate education otherwise than in the public schools of the State, the plaintiffs allege irreparable damage and the lack of an adequate remedy at law, and hence seek the injunctive relief of this Federal court of equity against continued refusal of the defendant trustees to readmit them to Pinetop Elementary School, asserting that such action of the trustees infringes First Amendment rights protected against State action by the Fourteenth Amendment.

The plaintiffs also allege that their conduct does not present any clear or present danger to the orderly operation of the school, which the State has the Constitutional power to prevent, and they deny that their refusal to stand while other pupils sing the Star Spangled Banner is conduct which is in anywise contrary to morals, health, safety or welfare of the public, the State, or the Nation.

The plaintiffs further allege that they have exhausted administrative remedies by appealing to the Board of Trustees of Pinetop Elementary School for an order exempting them from participation in the National Anthem ceremony; that such relief has been denied them, and that further appeal to the State Board of Education, or to the Superintendent of Public Instruction, would be futile, because it must be presumed that those officials would enforce the State statutes here involved, which make no provision for any exemption from the ceremony.

The plaintiffs pray that the State statutes in question be declared invalid, both on their face, and as applied by the administrative officials of the State. Because of this prayer, a three-judge District Court was convened pursuant to 28

U.S.C. § 2281. However, after hearing argument as to whether or not this case falls within the purview of § 2281, the three judges entered an order disempanelling the multi-judge court, and returned the case to a single judge. The Supreme Court dismissed the plaintiffs' appeal from that order [Sheldon v. Fannin, 372 U.S. 228, 83 S.Ct. 679, 9 L.Ed.2d 714 (1963)], and also denied the motion of the plaintiffs for leave to file a petition for writ of mandamus to challenge the correctness of the order [Sheldon v. Merrill, 372 U.S. 904, 83 S.Ct. 744, 9 L. Ed.2d 730 (1963)].

Before proceeding to a trial of the merits, I requested the parties to consider whether the order of the three-judge court, and the rulings of the Supreme Court with respect thereto, amounted to an adjudication that the action of the defendant trustees here sought to be enjoined is not "State action" within the scope of 28 U.S.C. § 1343 (3), and hence in legal effect a holding that this District Court does not have subject-matter jurisdiction of the claim to equitable relief which the plaintiffs here assert.

The complaint, as several times amended, draws in question various sections of the Arizona Revised Statutes. Section 15–102, which prescribes the duties of the State Board of Education, provides in part that:

"The state board of education shall:

\* \* \* \* \* \*

"14. Exercise general supervision over and regulate the conduct of the public school system.

"15. Prescribe and enforce a course of study in the common schools.

"16. Prescribe the subjects to be taught in all common schools.

\* \* \* \* \* \*

"18. Prescribe textbooks for the common schools, and shall prepare a list of three textbooks for each grade and each subject taught in the common schools for the selection by the school district of one book from such list for each student. \* \* \*" [Ariz.Rev.Stat. § 15–102.]

Authority for the Board of Trustees of each school district to make rules and regulations for the conduct of children attending school is granted by § 15–441, which declares that:

"A. The board of trustees shall prescribe and enforce rules for the government of the schools, not inconsistent with law or rules prescribed by the state board of education." [Ariz.Rev.Stat. § 15–441.]

Duties of the local Board of Trustees are prescribed in § 15–442, which provides in part that:

"A. The board of trustees shall:

\* \* \* \* \* \*

"2. Enforce the courses of study and select all textbooks used in the schools from the multiple lists determined and authorized by the state board of education \* \* \*." [Ariz. Rev.Stat. § 15–442.]

Section 15–1031, providing for the display of the flag and the holding of certain patriotic exercises, reads in part:

"B. The state superintendent of public instruction shall prepare for use in the public schools a program providing for a salute to the flag and other patriotic exercises, as meet the requirements of the different grades. \* \* \*" [Ariz.Rev.Stat. § 15–1031.]

The plaintiffs allege that, pursuant to the authority conferred by the above-quoted provisions of § 15–102, the State Board of Education prescribed a course of study in music for all children in rural elementary schools, of which Pinetop Elementary School was one, and issued music and song books to be used by the students therein whenever the principals or teachers called for school music assembly; that these song books contain the National Anthem and, as part of this course of study, the pupils are required to stand for the singing or playing of the National Anthem. The plaintiffs argue that the prescription of the music

study and issuance of music books by the State Board was a declaration of policy by that body equivalent to a regulation, although no formal regulation was issued, and that the Pinetop trustees were required by § 15–442, supra, to adopt and implement this policy, even though not embodied in a formal regulation.

The plaintiffs also allege that the defendant Dick, acting in his dual capacity as State Superintendent of Public Instruction, and as chief executive officer of the State Board of Education, did "prepare for use in the public schools a program providing for * * * other patriotic exercises * * *", within the meaning of § 15–1031(B), supra, by distributing to all county superintendents of education Opinion No. 61–21 of the Arizona Attorney General, in which the Attorney General expressed his concurrence in an earlier opinion of Coconino County Attorney to the effect that the school officials of Arizona may compel children of Jehovah's Witnesses to stand for the National Anthem, without violating their freedom of religion.

Finally, the plaintiffs allege that, acting pursuant to the general policy above-described, the Pinetop Board of Trustees instituted a musical program for general assemblies which included the playing of the National Anthem; that pupils were required to stand during the singing of the National Anthem by the assembled group; that it was at one of these assemblies that the plaintiffs refused to stand and were ordered by the principal to leave school; that this order was specifically authorized by the Pinetop Board of Trustees with full knowledge of the plaintiffs' conscientious objection; and that following expulsion of the children and refusal of the principal to re-admit them, the defendant Dick, acting in his dual capacity, made a special visit to the Pinetop school and ratified the actions of the principal and the trustees.

The plaintiffs urge that all of the above-described action was authorized by, done pursuant to, and amounted to "enforcement" of, the State statutes in question, within the meaning of 28 U.S.C. § 2281.

In their answer the defendants admit that the State Board prescribed the course of music study, but specifically allege that it was suggestive and not mandatory upon local school districts. The defendants argue, moreover, that none of the cited statutes require the plaintiffs to stand while the National Anthem is sung or played; that in all events no rule or regulation can be validly promulgated by an agency such as the State Board of Education, otherwise than by following the provisions of §§ 41–1001 to 41–1006 of the Arizona Revised Statutes, which require certification and filing in the office of the Secretary of State; and that the certificate of the Secretary of State declares no such rule or regulation has ever been filed.

The defendants also point out that the opinion of the Attorney General circulated by defendant Dick was that of a County Attorney addressed to a school board of his county, and was concurred in by the Attorney General as required by law [Ariz.Rev.Stat. § 15–122(B), solely to protect the members of the local school board from personal liability for acts done in reliance upon the opinion of the County Attorney. [See Ariz. Rev.Stat. § 15–436(B).]—And as to the course of study prescribed by the State Board of Education and followed by the Pinetop Board of Trustees, the Arizona Director of Elementary Education states that such courses of study are suggestive only and do not require standing for the National Anthem or expulsion for failure to stand.

It was the conclusion of the three-judge court, as a result of that court's inquiry into jurisdiction [see Land v. Dollar, 330 U.S. 731, 735, n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)], that the requirement the plaintiffs stand during the National Anthem "was not imposed by statute or by administrative action of any state agency or officer other than the local school board itself, and had no application to any other school district".

On the basis of this conclusion, the three-judge court held that it had no jurisdiction under 28 U.S.C. § 2281, which provides:

"An * * * injunction restraining the enforcement, operation or execution of any State statute * * or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title." [28 U.S.C. § 2281.]

In support of that decision the three-judge court cited: City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945); Ex parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249 (1940); Wilentz v. Sovereign Camp, 306 U.S. 573, 59 S.Ct. 709, 83 L.Ed. 994 (1939); Ex parte Public National Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202 (1928); Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L.Ed. 990 (1928).

In view of the very circumscribed definition of State action which the cited cases delineate as being within the ambit of § 2281, it is clear that the order of the three-judge court does not preclude subject-matter jurisdiction under 28 U.S.C. § 1343(3), which, repeating the essential substantive language of the Civil Rights Acts [42 U.S.C. § 1983], declares that:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: * * *

"(3) To redress the deprivation, under color of any State *law*, statute, *ordinance*, regulation, *custom* or *usage*, of any right, privilege or immunity secured by the Constitution of the United States * * *." [Emphasis added, 28 U.S.C. § 1343 (3).].

▮ The emphasized words from § 1343(3)—words which do not appear in § 2281—indicate that some forms of State action, although alleged to violate constitutional rights, may only be considered by a single-judge District Court. The Congress appears to have felt that a constitutional attack upon the conduct of State subdivisions or individuals acting, not as direct representatives of the State, but merely "under color of state law", does not question the very sovereignty of the State to the same degree as a constitutional attack directed against enforcement of State statutes and the administrative orders of State officials.

Two recent opinions of the Court of Appeals for the Ninth Circuit give support to this view. In Hatfield v. Bailleaux [290 F.2d 632 (9th Cir. 1961), cert. denied, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961)], State prisoners, invoking Federal jurisdiction under 28 U.S.C. § 1343(3), sought to enjoin State officials from enforcing certain prison regulations and certain customs and usages which, plaintiffs contended, unconstitutionally limited their research on and preparation of legal papers within the purview of 42 U.S.C. § 1983. On appeal it was held that a three-judge District Court was unnecessary, but at the same time the Court found jurisdiction under 28 U.S.C. § 1343 (3). The second case, Marshall v. Sawyer [301 F.2d 639 (9th Cir. 1962)], was a Civil-Rights-Act suit [42 U.S.C. § 1983] for damages and an injunction against Nevada officials allegedly responsible, through their publication of a "Black Book", for plaintiff's ouster from a casino. The Court held that this "Black Book" was not a State administrative order within 28 U.S.C. § 2281, and hence that a three-judge District Court was not required. Reversing the District Court's dismissal under the abstention doctrine, and remanding, the Court stated in dictum:

"The defendants' conduct was engaged in under color of state law if they were clothed with the authority of the state and were purporting to act thereunder, whether or not the

conduct complained of was authorized or, indeed, if it was proscribed by state law." [301 F.2d at 646.]

Furthermore, the recent case of Monroe v. Pape [365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)] has made it clear that only the most tenuous connection of the defendant with the State is necessary to constitute "State action" within the ambit of 28 U.S.C. § 1343(3). The Supreme Court there held, relying on United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) and Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), that the phrase "under color of any statute, ordinance, regulation, custom or usage, of any State * * *" included conduct of city police officers who could show no authority whatever under State law, custom or usage therefor; conduct which, in fact, actually violated the State constitution and laws. The Court there declared that 42 U.S.C. § 1983 was "meant to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position". [365 U.S. at 172, 81 S.Ct. at 476, 5 L.Ed.2d 492.] The rule of Monroe v. Pape has been applied recently by the Court of Appeals for the Ninth Circuit in two actions under 42 U.S.C. § 1983 against police officers seeking redress for illegal searches and seizures which are contrary to State law and in defiance of State policy and State authority. [See: Smith v. Cremins, 308 F.2d 187 (9th Cir. 1962); Cohen v. Norris, 300 F.2d 24 (9th Cir. 1962); see also: Maryland v. Heyse, 315 F.2d 312 (10th Cir. 1963); Hardwick v. Hurley, 289 F.2d 529 (7th Cir. 1961); Selico v. Jackson, 201 F.Supp. 475 (S.D.Cal. 1962).]

However reluctantly, all of the inferior courts in the Federal judicial hierarchy must follow the holding of Monroe v. Pape. Accordingly, I must hold that the action of the Board of Trustees of Pinetop School, which, as the three-judge court found, is the only action responsible for any of the plaintiffs' claimed injuries, constitutes "State action" within the jurisdictional provisions of 28 U.S.C. § 1343(3).

Turning now to the merits, I like to recall that the founding fathers inscribed upon the Great Seal of the United States the Latin phrase *novus ordo seclorum*— "a new order of the ages". This proud boast proclaimed their pride and their faith in the new nation they had founded here—a nation where everyone from the highest official to the most humble citizen must act under and in accordance with the law.

The keystone of this "new order" has always been freedom of expression—the widest practicable individual freedom to believe, to speak, to act.

Our forebears realized that ideas for preservation and improvement of a free society must come, not from the government, but from the people, and must compete for acceptance by the people, just as goods and services compete for acceptance in our free-enterprise economy. They realized too that in order to compete for acceptance, these ideas must be freely expressed by act and deed; that only in this way can the truth prevail; that only in this way can an idea despised today win the acceptance of reason tomorrow, or be thoroughly discredited; and that only by protecting the freedom of the smallest minority to express unpopular ideas by word or deed can the majority insure freedom to believe and express its own ideas, and to dispute and criticize those of others. [See Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes J., dissenting).]

This principle of freedom of belief and expression was so esteemed by the founding fathers that it was embodied in the First Amendment to the Constitution of the United States with the unqualified declaration that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and

petition the Government for a redress of grievances." And these freedoms have since been held protected against State action by the Fourteenth Amendment. [See, e. g., Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).]

However, the unqualified declaration of the first Amendment has never been literally enforced. [See: Konigsburg v. State Bar, 366 U.S. 36, 50, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Breard v. Alexandrie, 341 U.S. 622, 642 n. 33, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715 (1897); Gompers v. United States, 233 U.S. 604, 610, 34 S.Ct. 693, 58 L.Ed. 1115 (1914).] The right to believe, to speak, to act, in the exercise of freedom of expression, like all legal rights under our common-law system of justice, presupposes the correlative legal duty always to do whatever is reasonable, and to refrain from doing whatever is unreasonable, under the circumstances; and hence these fundamental rights are ever subject to such abridgements or restraints as are dictated by reason. [See: Speiser v. Randall, 357 U.S. 513, 521, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958); Pound, The Spirit of the Common Law, 182–183 (1921).]

But we so prize freedom of expression —deem it so essential to the maintenance of "a government of laws and not of men"—that the bounds of restraint upon First Amendment rights which will be tolerated as reasonable are narrow in the extreme.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." [West Virginia State Board of Education v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 1187, 87 L.Ed. 1628 (1943).]

It was in Schenck v. United States [249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470 (1919)]—a prosecution under the Espionage Act of 1917 [40 Stat. 217 (1917)]—that the criteria of permissible restraint upon freedom of expression were stated by Mr. Justice Holmes: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree."

"This is a rule of reason", Mr. Justice Brandeis later wrote, adding: "Correctly applied, it will preserve the right of free speech both from suppression by tyrannous, well-meaning majorities and from abuse by irresponsible, fanatical minorities. * * * [I]t can be applied correctly only by the exercise of good judgment; and to the exercise of good judgment, calmness is, in times of deep feeling and on subjects which excite passion, as essential as fearlessness and honesty." [Schaefer v. United States, 251 U.S. 466, 482–483, 40 S.Ct. 259, 264, 265, 64 L.Ed. 360 (1920).]

It is, of course, within the bounds of reasonable abridgement of freedom of expression, as Mr. Chief Justice Hughes pointed out in Near v. Minnesota [283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931)], that: "The security of the community life may be protected against incitements to acts of violence and the overthrow by force of orderly government." [See also: Whitney v. California, 274 U.S. 357, 373, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); Chafee, Free Speech in the United States, 129–135 (1941); Richardson, Freedom of Expression and the Function of Courts, 65 Har.L.Rev. 1 (1951).]

The standard of permissible restraint upon freedom of speech applies as well to freedom of religion. Thus, although the State may not establish a religion, it may curtail religious expressions by word or deed which create a clear and present danger of impairing the public health or safety, or of offending widely accepted moral codes,

or of resulting in a more-than-negligible breach of the peace. [Cf. Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); Feiner v. New York, 340 U.S. 315, 320, 71 S.Ct. 303, 95 L.Ed. 267 (1951); Chaplinsky v. New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

█ Notwithstanding offense to certain religious beliefs, the State may declare a uniform day of rest for its citizens [Braunfeld v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); Gallagher v. Crown Kosher Super Market, 366 U.S. 617, 81 S.Ct. 1122, 6 L.Ed.2d 536 (1961)]; regulate the practice of polygamy [Cleveland v. United States, 329 U.S. 14, 67 S.Ct. 13, 91 L.Ed. 12 (1946); Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878)]; regulate child labor [Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944)]; and require military training upon attendance at non-compulsory schools [Hamilton v. Regents, 293 U.S. 245, 55 S.Ct. 197, 79 L.Ed. 343 (1934)].

█ Where, however, a particular application of a general law not protective of some fundamental State concern materially abridges free expression or practice of religious belief, then the law must give way to the exercise of religion. Thus a State may not deny unemployment compensation to a Sabbatarian unwilling to accept Saturday employment. [Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).] Nor may it prohibit door-to-door solicitation of funds by colporteurs of religious tracts [Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943)], or even require them to pay a general license tax [Murdock v. Pennsylvania, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)]. And while a State may regulate the time, place and manner of solicitation upon public streets, it may not condition issuance of a permit therefor upon administrative determination of an applicant's religious status. [Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).]

Clearly, then, if the refusal to participate in the ceremony attendant upon the singing or playing of the National Anthem had not occurred in a public-school classroom, but in some other public or private place, there would be not the slightest doubt that the plaintiffs were free to participate or not as they choose. Every citizen is free to stand or sit, sing or remain silent, when the Star Spangled Banner is played.

█ But the case at bar involves refusal to participate in a public-school-classroom ceremony. Relying upon the recent "school-prayer" decisions [School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962)], the plaintiffs first argue that the National Anthem contains words of prayer, adoration and reverence for the Deity, and that a State's prescription of participation therein amounts to a prohibited "establishment of religion". This contention must be rejected. The singing of the National Anthem is not a religious but a patriotic ceremony, intended to inspire devotion to and love of country. Any religious references therein are incidental and expressive only of the faith which as a matter of historical fact has inspired the growth of the nation. [Cf., Engel v. Vitale, 370 U.S. 421, at 435, n. 21, 82 S.Ct. at 1269, 8 L.Ed.2d 601 (1962).] The Star Spangled Banner may be freely sung in the public schools, without fear of having the ceremony characterized as an "establishment of religion" which violates the First Amendment.

The plaintiffs next urge that coercing their participation, even to the extent of requiring them on pain of expulsion merely to stand while the other pupils sing the Star Spangled Banner, unreasonably abridges their rights to the free exercise of religion under the First Amendment. In considering this contention, it should be observed that lack of violation of the "establishment clause" does not *ipso facto* preclude violation of

the "free-exercise clause". For the former looks to the majority's concept of the term religion, the latter the minority's.

In view of the plaintiffs' avowed willingness to stand for the Pledge of Allegiance to the Flag, it may strain credulity that their claim of religious objection to standing as well for the National Anthem is bona fide or sincere. But all who live under the protection of our Flag are free to believe whatever they may choose to believe and to express that belief, within the limits of free expression, no matter how unfounded or even ludicrous the professed belief may seem to others. While implicitly demanding that all freedom of expression be exercised reasonably under the circumstances, the Constitution fortunately does not require that the beliefs or thoughts expressed be reasonable, or wise, or even sensible. The First Amendment thus guarantees to the plaintiffs the right to claim that their objection to standing is based upon religious belief, and the sincerity or reasonableness of this claim may not be examined by this or any other Court. [United States v. Ballard, 322 U.S. 78, 86–88, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); Cantwell v. Connecticut, 310 U.S. 296, 306–307, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); and see Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878).]

Accepting, then, the plaintiffs' characterization of their conduct as religiously inspired, this case is ruled by West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), where the Supreme Court held unconstitutional the expulsion of Jehovah's Witnesses from a public school for refusal to recite the Pledge of Allegiance to the Flag. The decision there rested not merely upon the "free-exercise clause", but also upon the principle inherent in the entire First Amendment: that governmental authority may not directly coerce the unwilling expression of any belief, even in the name of "national unity" in time of war.

Manifestly, the State's interest was much stronger in Barnette than in the case at bar. The sole justification offered by the defendants here is the opinion of the school authorities that to tolerate refusal of these plaintiffs to stand for the National Anthem would create a disciplinary problem. Evidence as to this is speculative at best and pales altogether when balanced against the "preferred position" of First Amendment rights. [Murdock v. Pennsylvania, 319 U.S. 105, 115, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).] Indeed, there is much to be said for the view that, rather than creating a disciplinary problem, acceptance of the refusal of a few pupils to stand while the remainder stand and sing of their devotion to flag and country might well be turned into a fine lesson in American Government for the entire class.

This is not to suggest, however, that freedom of expression permits any unruly or boisterous conduct of word or deed which is in fact disruptive of order or discipline in the classroom or the school, or to suggest that the school must award a passing mark or grade to a student who refuses or fails to do required school work.

Since it appears that the conduct of the pupils involved here was not disorderly and did not materially disrupt the conduct and discipline of the school, and since there is a lack of substantial evidence that it will do so in the future, a writ of injunction will issue permanently restraining the Board of Trustees of Pinetop Elementary School from excluding the plaintiffs from attendance at the school solely because they silently refuse to rise and stand for the playing or singing of the National Anthem. The injunction will run against the defendant members of the Board of Trustees only since, as the three-judge panel found, it is there action alone which brought about the expulsion. All parties will bear their own costs.

This memorandum of decision will serve as the findings of fact and con-

clusions of law in this action. [Fed.R. Civ.P. 52(a), 28 U.S.C.A.]. The plaintiffs' attorneys will serve and lodge with the Clerk, within ten days, a form of proposed judgment pursuant to Fed.R.Civ.P. 58. [28 U.S.C.A.]