Andrew Robert BANKS, Plaintiff,

v.

BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, a body corporate, Defendant.

Robin MOBLEY, by her mother and next friend, Francine Mobley, etc., Plaintiff,

v.

G. Holmes BRADDOCK, Chairman of the Board of Public Instruction, Dade County, Florida, et al., Defendants.

Michael HILL, by his father and next friend, Richard Hill, Plaintiff,

v.

The BOARD OF PUBLIC INSTRUCTION OF DADE COUNTY, FLORIDA, etc., et al., Defendants.

Nos. 70–197–Civ–TC, 70–241–Civ–TC, 70–248–Civ–TC.

United States District Court,
S. D. Florida.

June 26, 1970.

Beverly Gurevitz, Miami, Fla., for plaintiff Banks.

C. Michael Abbott and Bruce S. Rogow, Miami, Fla., for plaintiff Mobley.

Tobias Simon, Miami, Fla., for plaintiff Hill.

George C. Bolles, and Robert A. Ware, Bolles, Goodwin, Ryskamp & Ware, Miami, Fla., for defendants.

Before SIMPSON, Circuit Judge, and MEHRTENS and CABOT, District Judges.

1. See Appendix I for text.

2. See Appendix II for text.

## MEMORANDUM OPINION AND FINAL JUDGMENT

CABOT, District Judge:

Final hearing in these consolidated cases was held on May 25, 1970, before the three-judge court convened pursuant to the provisions of 28 U.S.C. §§ 2281 and 2284. The cases all involve the common question of the facial constitutionality of Florida Statute 232.26, F.S.A.,[1] which provides for suspension of public school children for misbehavior. They also present the issue of the validity of School Board Policy-Regulation 5114[2] which was enacted under the statute, as well as other issues not common to all three cases. The backgrounds of the separate cases follow.

### Banks v. Board of Public Instruction of Dade County

Plaintiff, Andrew Robert Banks, a senior at Coral Gables High School, filed his amended complaint by his guardian ad litem alleging he was suspended from school as a result of his refusal to stand during the pledge of allegiance. The complaint seeks class relief and a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that Florida Statute 232.26, F.S.A. and School Board Policy-Regulation 5114, issued thereunder, are unconstitutional on their face as being vague, overbroad, and indefinite, and for failure to provide prior notice and hearing so as to comport with procedural due process of law. The plaintiff also challenges the constitutionality of School Board Policy-Regulation 6122, entitled "Guidelines for Instruction Pertaining to the Flag, Pledge of Allegiance, and National Anthem,"[3] asserting that the regulation violates the free speech and expression guarantee of the First Amendment as applied to the states through the Fourteenth Amendment to the United States Constitution.

The constitutional application of the statute and the policy-regulations are

3. See Appendix III for text.

also challenged, and in this regard the parties have stipulated that the transcript of testimony taken at the earlier hearing on the application for temporary injunction to restore plaintiff to school attendance (which was granted) may be received in evidence. Finally, at the time of final hearing, defendants' motion to dismiss the cause as a class action was pending for determination by the full court.

### Mobley v. Braddock; Hill v. Board of Public Instruction of Dade County

On February 25, 1970, Robin Mobley, a student at Drew Junior High School, was suspended for walking through Drew Elementary School, a facility on the same school compound, during school hours without permission. On February 27, 1970, Michael Hill, a student at Parkway Junior High School, was suspended for possession of marbles. Both acts were contrary to established rules of which the suspended students had knowledge. The complaints in these suits were filed by the minors' legal guardians and seek a declaration pursuant to 28 U.S.C. §§ 2201 and 2202 that Florida Statute 232.26, F.S.A. and School Board Policy-Regulation 5114, issued thereunder, are unconstitutional on their face as being vague, overbroad, and indefinite, and for failure to provide prior notice and hearing so as to comport with procedural due process of law. The constitutional application of the statute and the policy-regulation are challenged in both cases, and in this regard the parties have stipulated that the transcript of testimony taken at the earlier hearings on applications for temporary injunction to restore the plaintiffs to school attendance (which were denied) may be received in evidence. At the time for final hearing no motions were pending for consideration by the court in *Hill,* but in *Mobley* there awaits for determination by this panel the defendant's motion to dismiss the cause as a class suit.

We turn now to a discussion of the issues:

### Class Action Relief

The complaints in *Banks* and in *Mobley* alleged that the suits are being brought on behalf of the named plaintiffs and on behalf of all others similarly situated who have been or will be threatened with suspensions from schools in Dade County, Florida, pursuant to the authority vested in the county's school principals by Florida Statute 232.26 and Policy-Regulation 5114. Additionally, in *Banks* the class was alleged to consist of those students in the Dade County school system who are subject to the provisions of School Board Policy-Regulation 6122. The defendants in these two cases have filed motions to dismiss alleging that class relief is not appropriate to these cases.

Rule 23(a) of the Federal Rules of Civil Procedure provides that one or more members of a class may sue or be sued as representative parties on behalf of all only if there are questions of law or fact common to the class and the remaining requirements of subsections (a) and (b) are satisfied.

In both *Mobley* and *Banks,* the complaints fail to show the existence of a question of law or fact common to the class of persons alleged to be subject to the statute and Regulation 5114.

The reasons for which students may be lawfully suspended from school are limited only by the varieties of misbehavior which their ingenuity can devise. They are so numerous as to defy listing.

If the statute is facially unconstitutional the judgment so declaring will apply throughout the state without the necessity for class relief. On the other hand, in considering the constitutionality af the statute as applied, a different set of facts surrounds each suspension. The constitutional issue, therefore, is variable, one of mixed law and fact, and precludes the finding of a question of law or fact common to the class as described. The defendants' motion strik-

ing this aspect of the class relief will be granted.

■ *Banks*, however, also challenges the constitutionality of Policy-Regulation 6122 and alleges this to be a matter appropriate for class relief, with the class consisting of all those Dade County public school students who refuse to stand during the pledge of allegiance ceremony, but merely sit in their seats, and therefore have been suspended or are subject to suspension. Thus, there is a question of law common to the members of this class.

Moreover, the court finds that the plaintiff will fairly and adequately protect the interests of the class and that the party opposing the class has acted on grounds generally applicable to the class. *See* Frain v. Baron, *infra*, for a similar result. Class relief is appropriate in *Banks* and the defendants' motion will be denied.

*Facial Constitutionality of Florida Statute 232.26*

Florida Statute 232.26 F.S.A. provides in pertinent part as follows:

*Authority of Principal.* * * * The principal may suspend a pupil for wilful disobedience, for open defiance of authority of a member of his staff, for use of profane or obscene language, for other serious misconduct, and for repeated misconduct of a less serious nature; provided, that each such suspension with the reasons therefor shall be reported immediately in writing to the parent and to the county superintendent. * * *

The plaintiffs in these consolidated cases assert that the statute is unconstitutional on its face as being vague, overbroad, and indefinite, and for its failure to provide for prior notice and hearing so as to comport with procedural due process of law.

*Vagueness—Overbreadth.* Plaintiffs assert that the statutory language is vague because " * * * men of common intelligence must necessarily guess at its meaning and differ as to its ap-

plication." Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322. They point out that the "void for vagueness doctrine" applies to civil as well as criminal actions, Boutilier v. Immigration and Naturalization Serv., 1967, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661, and that the doctrine has been applied in reviewing both university, Soglin v. Kauffman, W. D.Wis.1968, 295 F.Supp. 978, aff'd 7 Cir. 1969, 418 F.2d 163, and high school sanctions, Sullivan v. Houston Independent School District, S.D.Tex.1969, 307 F.Supp. 1328. Analyzing each phrase separately, the plaintiffs have attempted to show that the language of the statute does nothing more than allow school administrators unfettered discretion in meting out suspensions. We disagree.

■ In order to resolve the question of whether or not the plaintiffs were denied their constitutional rights it is important to weigh and contrast the gravity of those rights with the interest of the state in maintaining discipline in the educational system. It has alwas been within the province of school authorities to provide by regulation for the prohibition and punishment of acts calculated to undermine the school routine. Obviously, such authority is necessary and proper. Blackwell v. Issaquena County Board of Education, 5 Cir. 1966, 363 F.2d 749, 753.

The Supreme Court has on several occasions " * * * emphasized the need for affirming the comprehensive authority of the states and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." Tinker v. Des Moines Independent Community School District, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. In this regard it should be obvious that:

* * * in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First and Fourteenth Amendments the courts must give full credence *to the role and purposes of the schools and of the tools*

*with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner.* [Emphasis added.]

Clearly, the community

* * * expects that the requirements of order, and of protection and implementation of the educational program of the school, will be met by limited enforcement means—the force of the school establishment itself and the school related disciplines of reprimand, suspension, and expulsion—recognizing that the school room is an inappropriate place for the policeman to be either called or needed. Godbold, J., specially concurring in Ferrell v. Dallas Independent School District, 5 Cir. 1968, 392 F.2d 697.

█ The proper operation of the public school system is one of the highest and most fundamental responsibilities of the state. *Blackwell, supra.* In order to fulfill that responsibility, we acknowledge the power of school authorities to discipline students, but do not require that school suspension statutes satisfy the same rigorous standards as those imposed upon criminal statutes. Soglin v. Kauffman, *supra* 418 F.2d at 168; Sullivan v. Houston Independent School District, *supra* 307 F.Supp. at 1344; Buttny v. Smiley, D.Colo.1968, 281 F.Supp. 280. What is required is that basic notions of justice and fair play be employed within the school setting to insure that the standards for acceptable conduct are easily understood. Florida Statute 232.26, F.S.A., does use broad language but the rules of conduct contained therein are not so vague as to require the court to declare them invalid. Although not all of the statutory language to which plaintiffs object is couched in specific prohibitions, it is obvious that the many and varying types of misconduct which justify a suspension are incapable of exact description and, therefore, necessitate the use of encompassing words.

The language objected to in the statute, though it might be condemned as constitutionally deficient if included in a criminal statute, does set standards which are readily determinable and easily understood within the framework of the public school system. Individual analysis of the terms is not necessary. The statute is neither vague nor overbroad but rather is necessary to the proper operation of the public school system and therefore constitutionally sound.

█ Finally, it should also be recognized that the right of the school board to discipline students is not solely dependent upon Florida Statute 232.26, F.S.A., Florida Statute 230.23(6) (c), F.S.A. delegates to the county school boards the power to promulgate rules and regulations for the control, discipline, and suspension of students. In like manner Florida Statute 230.22, F.S.A. empowers the county school boards to adopt such policies, rules, and regulations as are deemed necessary for the efficient operation and general improvement of the county school system. Florida Statute 232.26, F.S.A., therefore, is merely a statute specifically limiting the authority of the principal to suspend, and even without it, school authorities, by virtue of the cited statutes, as well as the powers inherent in their offices, have the power to suspend and otherwise discipline students for misbehavior.

*Due Process.* The plaintiffs in all of these cases have alleged that Florida Statute 232.26 F.S.A. and Policy-Regulation 5114 are unconstitutional as violative of due process of law in that they permit a school principal to suspend a student for a period up to ten days without affording him a prior notice and hearing of the charges.

The plaintiffs place heavy reliance on Dixon v. Alabama State Board of Education, 5 Cir. 1961, 294 F.2d 150. In *Dixon* the court held that due process requires notice and some opportunity for hearing before students at a tax supported college are expelled for misconduct. Since 1961 numerous cases have adopted

the view expressed in *Dixon* to the extent that this holding is well established and widely acknowledged. *See, e. g.,* Woods v. Wright, 5 Cir. 1964, 334 F.2d 369, Stricklin v. Regents of Univ. of Wisconsin, W.D.Wis.1969, 297 F.Supp. 416, Marzette v. McPhee, W.D.Wis.1968, 294 F.Supp. 562, Due v. Fla. A. & M. Univ., N.D.Fla.1963, 233 F.Supp. 396.

Florida Statute 232.26, F.S.A. provides that when a student is suspended "the reasons therefor shall be reported immediately in writing to the parent and to the county superintendent. * * * *" The statute does not provide for a hearing prior to suspension. Policy-Regulation 5114 recognizes that "suspension[s] * * * are extreme measures to be employed only when all available school resources are exhausted and school personnel are unable to cope constructively with pupil misconduct." The regulation details the authority of both the principal and the superintendent and sets forth the procedures to be employed in suspending or expelling students. It provides that when a student is to be suspended from school for up to ten days the principal shall prepare a notice of suspension, the original copy of which is to be sent to the child's parents. Form 37, the standard form notice of suspension which is provided for in the regulation, provides blanks for the student's name and the reason for the suspension, and ends with an invitation to the parents to contact the school to discuss the matter more thoroughly with the authorities. The regulation further provides that every effort shall be made to contact the parent or parents of a pupil who is being suspended in order to inform them of the reason for the suspension and that a formal notice of suspenion has been sent to them in the mail. The regulation does not provide for a hearing prior to suspension.

The plaintiffs assert that before students at a public school can be suspended they must be given a hearing with notice of the charges. The requirement of a hearing, of course, is nothing more than fair play. However, it does not follow that the hearing need be prior to the suspension. The right to a hearing, when analyzed within the setting of the public school system, is necessarily subject to limitations imposed in order to insure the orderly administration of education and to preserve both decorum in the classroom and respect for teachers and administrators.

The touchstone for sustaining school regulatory and disciplinary legislation is the demonstration that it is necessary to alleviate interference with the educational process. *Tinker, supra,* Ferrell v. Dallas Independent School System, *supra* 392 F.2d at 703. Thus the plaintiffs here do not urge, nor could they successfully, that educators may not lawfully discipline students in summary fashion in a riot or other emergency. This is so because such a riot or emergency by its nature disrupts the educational process and threatens both the welfare and safety of students and the preservation of the school plant.

Providing a hearing to a student *prior* to his suspension for misconduct itself produces a disruptive effect upon the educational process. Consider, for example, misconduct which occurs during class. If the misconduct in the teacher's opinion justifies suspension, it would also seem to require that the student be immediately removed from the room as the teacher must be able to continue the teaching process without undue interference. If a hearing is to be held prior to suspension the teacher must leave the room with the student or leave a later scheduled class in order to offer testimony. Those students who were witness to the misconduct must likewise leave the room or spend class time preparing written statements to be presented at the hearing. If the teacher leaves the room the class in the meantime must be left either without supervision or under the guidance of one who is ill-prepared or needed elsewhere. In any event the likelihood is that the remaining students would suffer in their pursuit of an education.

If the misconduct should occur in a common area, such as the cafeteria, the hallways, or a recreation area, it is likely that a number of staff and student witnesses must be called out of class to "testify" at such a prior hearing, thus multiplying the disruptive effect on the educational process. The parents, of course, must be notified of the hearing and told to come to the school immediately to confer with their child and help prepare his "case."

If, on the other hand, both student and teacher remain in class following the incident until a later time, perhaps the end of the school day, the authority of the teacher and the respect in which he is held will suffer. Moreover, allowing the student who has misbehaved to remain in class is certain to have a disruptive effect.

If the hearing is to be held after school, student witnesses must be kept late to testify and the "offender" will no doubt be conferring with them throughout the remainder of the day both in and out of class in order to prepare for the hearing. Of course, there is the possibility that the teacher might remain in class and just send the student to the principal to be kept in detention until the hearing. But this alternative would prevent the student from conferring with witnesses and preparing his case. It is apparent that providing public school students with hearing prior to suspension would result in a disruption of the educational process which cannot be permitted.

In reaching this conclusion we have attempted to balance the rights of public school students with the demands imposed upon the educators by the community at large. Public school children suspended for misconduct are not criminals. The legal processes due them are less exacting than that due one who is accused under a criminal statute. The procedure set forth in the statute and regulation are consistent with the constitutional guarantee of due process of law in a school setting, are educationally sound, and necessary to the proper ad-

ministration of the educational process. Recognizing the objectives of our public school system and of the tools with which school administrators must deal with student disciplinary problems, it does not appear that either the statute or the regulation is facially unconstitutional.

■ There is a dearth of cases involving the suspension of public school students for misconduct which occurred in the school plant. Dixon v. Alabama State Board of Education, *supra*, involving college students, is of course persuasive and this court adopts that decision insofar as it requires that notice be given, a hearing provided for, and that the hearing include the rudimentary adversary elements. Thus, the students should be given specific notice of the charges, the names of witnesses with a summary of their testimony, and should be given the opportunity to refute the charges by oral or written testimony. We do not, however, require, as *Dixon* does, that the hearing be held prior to the suspension.

There are significant factual distinctions between *Dixon* and this case—between a college suspension and a public school suspension. For example, in a college or university, teachers and students are rarely in class for more than a few hours a day, whereas in the public school system teachers and students are in class throughout the day. While public school teachers and administrators would be called upon to miss class if a prior hearing is held, the same is not usually true in colleges and universities. The disruption of the educational process that occurs as a result of a prior hearing therefore is less likely to occur in the college than it is in the public school.

Additionally, the consequences of a public school suspension are considerably less serious than those which follow from a university suspension. In fact, School Board Policy-Regulation 5114 provides, in cases of ten-day and thirty-day suspensions, that there shall be no evidence of the suspension posted on the pupil's

permanent record. However, suspension or expulsion from a college or university may seriously affect a student's opportunity to obtain a graduate or postgraduate degree, or otherwise achieve professional status.

The procedures set forth in the statute and the regulation provide for immediate notice of the suspension and the reasons therefor to be sent to the parents, and for the parents to be notified of the suspension before the student can be sent home. Moreover, the notice of suspension invites the parents to contact the school if they desire to discuss the matter. This procdure, which provides for a hearing after the fact upon request of the parents, while somewhat informal when contrasted with criminal procedure, is nonetheless consistent with the dictates of due process when examined in light of the public school setting.

Accordingly, we hold that the procedures set forth in Florida Statute 232.26, F.S.A. and School Board Policy-Regulation 5114 are necessary to insure the orderly administration of the educational process and, therefore, are consistent with the due process provisions of the Fifth and Fourteenth Amendments to the United States Constitution.

*Constitutional Application of Florida Statute 232.26 and Policy-Regulation 5114*

Finally, the plaintiffs in these cases contend that the statute and the policy-regulations were unconstitutionally applied to them. As previously mentioned, the parties have all stipulated that the transcripts of testimony taken on the applications for temporary relief may be introduced in evidence and used for the purpose of disposing of this issue.

The testimony elicited at the hearing on the motion for temporary relief in *Banks* centered primarily upon the reason for the suspension, i. e., the plaintiff's refusal to stand during the pledge of allegiance ceremony. Nothing in the record supports a finding that the statute was unconstitutionally applied. The plaintiff has simply failed to sustain his burden of proof on this issue.

The testimony taken on the motion for temporary relief in *Hill* establishes that he was not denied due process of law as a result of the application of either the statute or the regulation.

Michael Hill was suspended from school at the end of the school day on Thursday, February 26, 1970, for what he thought was the throwing of marbles, which he admitted having on his person during school hours. The notice of suspension sent to his home arrived on Saturday, February 28, 1970, and indicated that the suspension was for possession of marbles. The notice, which was sent in accordance with the mandate of the statute and the policy-regulation, invited the parents to contact the school, if they desired to discuss the matter. The record reflects that on learning of their son's suspension, the parents did not call the school themselves but rather retained an attorney who called for them, and on the principal's refusal to reinstate their son, the parents, before personally contacting the school or going there for a conference, filed suit Friday afternoon, February 27, 1970, challenging the constitutional validity of the statute. While the parents had the right to employ an attorney and seek redress of their grievance in court, the transcript reflects that of the eight boys who were suspended with the Hill child for the possession of marbles all but this plaintiff and his parents went to see the principal and discuss the matter, and all but this plaintiff were reinstated.

The Fifth Circuit, on May 26, 1970, in Stevenson v. Board of Education, Wheeler County, Georgia, 426 F.2d 1154, not yet reported, a case involving constitutional attack on a school board "good grooming rule," stated that the district court should have required that the plaintiffs be first referred to the Board of Education to insure that the action complained of was final within the institution in the sense that it was ripe for adjudication. This case dem-

onstrates the wisdom of that rule, for it appears that the plaintiff was not deprived of due process of law by the application of the statute or the policy-regulation, but rather that both he and his parents failed to employ the informal procedures available to them under the statute and the regulation.

The record in *Mobley* indicates that she was apprehended by Board of Public Instruction security officials on the morning of February 19, 1970, at nine o'clock while walking through Drew Elementary School, a separate facility adjacent to the junior high school she was attending. The notice of suspension, hand delivered to the plaintiff's mother by a visiting teacher on the afternoon of the suspension, states the reason for the suspension, and the record indicates that plaintiff knew that junior high school students were not permitted in the elementary school during school hours. This rule of conduct was designed to prevent students from the junior high school from trespassing upon the elementary school grounds and disrupting classes therein, a problem which frequently occurred during the school year. The assistant principal, the individual charged with the investigation of this matter, testified that upon Robin's being brought to his office he heard her explanation as to why she was off school property and at the elementary school, and attempted to independently verify her explanation which he found inadequate. The record further reflects that the plaintiff was advised of the serious nature of the conduct and was told by the assistant principal that a ten day suspension would be recommended. The school principal testified that Mrs. Mobley and Robin returned to the school the day of the suspension and had a conference with him about the matter. Moreover, Mrs. Mobley was given the opportunity to and did confer with the principal on a second occasion.

The record clearly indicates that the suspension was lawful, that notice of the charges was given orally to the plaintiff and in writing to her mother, and that the informal hearings and conferences conducted with the child by the assistant principal and with the child and her mother on two occasions by the principal, were sufficient to comport with due process of law. Neither the statute nor the policy-regulations were unconstitutionally applied to this plaintiff.

### Regulation 6122
*Guidelines for Instructions Pertaining to the Flag, Pledge of Allegiance, and National Anthem*

The facts essential to the disposition of the case are not in dispute. Andrew Robert Banks was suspended from school on January 29, 1970, for a period of ten days, and again suspended for a like term on February 9, 1970, for his refusal to stand in accordance with the procedure contained in School Board Policy-Regulation 6122 during the flag salute ceremony conducted each morning in the homeroom period. The regulation states that "students who for religious or other deep personal conviction, do not participate in the salute and pledge of allegiance to the flag will stand quietly."

The plaintiff asserts that he has the constitutional right to refuse to stand for the pledge and salute and that his suspension constituted a penalty imposed upon him for the exercise of his constitutional right of free speech and expression. The defendant has denied that the plaintiff's refusal to stand was an exercise of his constitutional right of free speech and expression and has asserted that there is a compelling governmental purpose to be served in requiring students to stand during the pledge.

In West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, the Supreme Court, overruling Minersville School District v. Gobitis, 1940, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, held that a West Virginia State Board of Education resolution which required children, as a prerequisite to their continued attendance at public school, to salute the flag and recite the pledge, was unconstitutional as applied to children of Jehovah's

Witnesses since it denied them freedom of speech and freedom of worship. In rejecting the resolution the court held that the state could not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," nor can the state "force citizens to confess by word or act their faith therein." *Barnette* at 624, 63 S.Ct. at 1187. In holding that the state could not compel obedience to its symbol at the expense of First Amendment rights, save "grave and immediate dangers to interests which the state may lawfully protect," the court observed that:

> Freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of substance is the right to differ as to things that touch the heart of the existing order. *Barnette,* at 642, 63 S.Ct. at 1187.

Without more *Barnette* would be dispositive of this matter for Andrew Banks was suspended for his refusal to act in accordance with a regulation, the operation of which prevented him from exercising his First Amendment rights. Yet, the tenor of *Barnette* is negative. It prohibits the state from compelling individuals to act in a certain manner; it is not a recognition of student's rights. On the other hand, the Supreme Court's decision in Tinker v. Des Moines Independent Community School District, 1969, 303 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731, speaks affirmatively. There the court held that public school students could not be suspended for wearing black arm-bands to protest American involvement in Vietnam, a form of silent protest and non-disruptive First Amendment expression in the classroom. In writing for the majority, Mr. Justice Fortas stated that:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either teachers or students shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. *Tinker* at 506, 89 S.Ct. at 736.

The court recognized that "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Tinker* at 503, 89 S.Ct. at 739. However, the court was careful to point out that:

> [c]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of free speech. *Tinker* at 513, 89 S.Ct. at 740.

The conduct of Andrew Banks in refusing to stand during the pledge ceremony constituted an expression of his religious beliefs and political opinions. His refusal to stand was no less a form of expression than the wearing of the black arm-band was to Mary Beth Tinker. He was exercising a right "akin to pure speech."

 The plaintiff testified that the basis of his refusal to abide by the regulation was his religious beliefs. He testified that he is a Unitarian, that he believes a "Uni-world" government is necessary to world peace, that he intends to be a Unitarian minister, and further that his refusal to stand was a simple protest against black repression in the United States. A student in the plaintiff's homeroom who sits next to him testified that when the flag salute period comes, "Sometimes he [Banks] stands up and doesn't say anything and sometimes he just sits down but he doesn't cause any disturbance in class or you know, make the other kids—make it conspicuous just what he is doing." The unrefuted testimony clearly reflects that the plaintiff's refusal to stand has not caused any disruption in the educational process. While there may be some who would question the sincerity with which this plaintiff holds his religious and political views, such inquiry is not a prop-

er consideration for a court. The First Amendment guarantees to the plaintiff the right to claim that his objection to standing during the ceremony is based upon religious and political beliefs. West Virginia State Board of Education v. Barnette, *supra* 63 S.Ct. at 1183; United States v. Ballard, 1944, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148; Cantwell v. Connecticut, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213; Sheldon v. Fannin, D.Ariz.1963, 221 F.Supp. 766.

The flag is a symbol of our government. Its colors, its stripes, and its stars represent our country and all that it is, its history and accomplishments, its hopes and aspirations. Mr. Justice Jackson, writing for the majority in *Barnette,* recognized that symbols of state, such as the crown, the mace, the altar, and even black robes, often have associated with them gestures of acceptance or respect including the salute, a bowed or bared head, or a bended knee. Likewise, standing is an integral portion of the pledge ceremony and is no less a gesture of acceptance and respect than is the salute or the utterance of the words of allegiance. Here, as in *Barnette,* the regulation required the individual to communicate, by standing, his acceptance of and respect for all that for which our flag is but a symbol.

The same conclusion has been reached on facts virtually identical to those presented in the instant case in Sheldon v. Fannin, D.Ariz.1963, 221 F.Supp. 766. There the court issued a permanent injunction restraining the state board of education from suspending for insubordination students who, because of their religious beliefs as Jehovah's Witnesses, refused to stand during the singing of the national anthem. That court, relying heavily upon West Virginia v. Barnette, recognized that the First Amendment guarantee protects even the expressions of beliefs which appear to be ludicrous and unfounded. The court stated that "[w]hile implicitly demanding that all freedom of expression be exercised reasonably under the circumstances, the Constitution fortunately does not require

that the beliefs or thoughts expressed be reasonable, or wise, or even sensible."

In a recent case, Frain v. Baron, E.D. N.Y.1970, 307 F.Supp. 27, the court issued a temporary injunction enjoining the defendant administrators of the New York school system from excluding the plaintiffs from their classrooms during the pledge of allegiance. The opinion reflects that the students who refused to leave the room and stand in the hall so acted because of a mixture of religious and political beliefs. The court there also relied heavily upon *Barnette* and *Tinker* in supporting its position.

The right to differ and express one's opinions, to fully vent his First Amendment rights, even to the extent of exhibiting disrespect for our flag and country by refusing to stand and participate in the pledge of allegiance, cannot be suppressed by the imposition of suspensions. It is, therefore, clear that School Board Policy-Regulation 6122 is in direct conflict with the free speech and expression guarantee of the First Amendment as applied to the states through the Fourteenth Amendment to the United States Constitution.

This memorandum opinion shall serve as findings of fact and conclusions of law in these cases.

Accordingly, it is ordered and adjudged that:

1. Defendants' motion to dismiss plaintiff's application for class relief in the case of Mobley v. Braddock, No. 70–241–Civ–TC, is treated as a motion to strike and as such is granted.

2. Defendants' motion to dismiss plaintiff's application for class relief in the case of Banks v. Board of Public Instruction of Dade County, Florida, No. 70–197–Civ–TC, is treated as a motion to strike and as such is denied.

3. Florida Statute 232.26, F.S.A. is hereby declared constitutional.

4. School Board Policy-Regulation 5114 is hereby declared constitutional.

5. School Board Policy-Regulation 6122 is hereby declared unconstitutional

as violative of the First and Fourteenth Amendments to the United States Constitution, and the Dade County Board of Public Instruction is permanently enjoined from enforcing its provisions.

6. Neither Florida Statute 232.26, F. S.A. nor Policy-Regulation 5114 have been unconstitutionally applied to these plaintiffs.

## APPENDIX I

### FLORIDA STATUTE 232.26

**232.26** *Authority of Principal*

Subject to law and rules and regulations of the state board and of the county board, the principal or teacher in charge of a school may delegate to any teacher or other member of the instructional staff or to any bus driver transporting pupils of the school such responsibility for the control and direction of the pupils as he may consider desirable. The principal may suspend a pupil for wilful disobedience, for open defiance of authority of a member of his staff, for use of profane or obscene language, for other serious misconduct, and for repeated misconduct of a less serious nature; provided, that each such suspension with the reasons therefor shall be reported immediately in writing to the parent and to the county superintendent; and provided, further, that no one suspension shall be for more than ten days and that no suspension shall be made a dismissal unless so ordered by the county board in a resolution adopted and spread upon its minutes. He may suspend any pupil transported to or from school at the public expense from the privilege of riding on a school bus for a period of ten days, or until such suspension is modified or made a dismissal by the county board, giving immediate notice in writing to the county superintendent and to the parent as provided above.

## APPENDIX II

*Elementary and Secondary*

*Suspension and Expulsion*

Suspension and expulsion are extreme measures to be employed only when all available school resources are exhausted and school personnel are unable to cope constructively with pupil misconduct. Suspension from school may be authorized by the principal or Superintendent for a short period of time. Expulsion from school requires action of the Board to effect and rescind.

*Principal's Authority*

The principal shall have the authority to:

1. Suspend a pupil from school for a period of not more than 10 school days for any one suspension.

2. Recommend to the Superintendent, with the approval of the district superintendent, that a pupil (a) be suspended by the Superintendent up to an additional 30 school days or (b) be suspended by the Superintendent up to an additional 30 school days and be expelled by the Dade County School Board.

*Superintendent's Authority*

The Superintendent shall have the authority to:

1. Suspend a pupil up to 30 school days or assign a pupil to an individually designated program or other special placement.

2. Recommend to the Board that a pupil be dismissed permanently or for a specified period of time.

3. Recommend assignment of a pupil to be expelled from his regular school to an individually designated program or to other special placement.

*Expulsion by the Dade County School Board*

In recommending expulsion by the Board, the principal shall present a report on the school record of the pupil, (attendance, conduct, academic progress, and suspensions) as well as contacts of school personnel with the pupil and family.

Upon recommendation of the Superintendent:

1. The Board may expel from school any pupil (a) having, using or handling substances that modify mood and/or behavior or (b) bringing to school or having in his possession a deadly weapon including but not limited to a gun, knife, razor, explosives and ice pick.

Rev. eff.: 3/26/69; 11/5/69
16"

2. The Board also may expel from school any pupil involved in a serious breach of conduct such as an assault on school personnel or on other pupils, lewd or lascivious behavior, arson or serious vandalism or misbehavior which disrupts the orderly conduct of the school.

3. The Board also may expel pupils for less serious but continuing misconduct, which may include the use of profane, obscene or abusive language, that seriously affects the school program in a negative way. In making a recommendation for this type of expulsion, the principal shall present a written report on measures taken to bring about the proper conduct of the pupil.

*Procedures: Pupil Expulsion Hearings*

The following procedures will be observed when the Superintendent recommends a student for expulsion.

1. Pupil May Request a Hearing

 The Superintendent shall by certified mail or by hand delivery by appropriate staff member notify the pupil's parents or guardian of school record that he is recommending that their child be expelled from the Dade County schools. This letter shall set forth the charges against the pupil and advise the parent that he has seven days in which to request a hearing on those charges before a hearing committee.

 Should the parent not request a hearing within the specified time, the Board will act on the Superintendent's recommendation at the first available Board meeting. Said recommendation will set forth a brief statement of the pupil's act or acts which warrant expulsion.

2. Hearing

 Should the pupil's parent request a hearing, the hearing shall be conducted before one of the hearing examiners appointed by the Board and shall be conducted under the rules and procedures for administrative hearings adopted by Board Resolution 63–19. (See Regulation 4119.-5.)

Legal Reference: Florida Statutes, 230.-23(8) [6] (c)); 230.33(8) (c); 232.26

DADE COUNTY SCHOOL BOARD
Miami, Florida

Policy adopted: 12/7/66
Effective: 12/7/66
Rev. eff.: 3/26/69; 11/5/69
16"

*Elementary and Secondary*

Suspension, Expulsion, Exclusion, Juvenile Court and Protective Services Referrals

1. Suspension, 10 Days or Less

 The principal has the authority to suspend a pupil from school up to 10 days for any one offense.

 When a pupil is to be suspended from school up to 10 days by the principal, the principal shall prepare in triplicate Form 37; *Notice of Suspension.* The original copy is sent to the parent, a copy is sent to the district superintendent and a copy is filed in the pupil's cumulative guidance record. There shall be no evidence of the 10-day suspension posted on the pupil's permanent record other than that reflected by his attendance record. The copy filed in the pupil's cumulative guidance record may be removed later, with the approval of the principal, when the pupil's behavior becomes more acceptable.

 Every effort shall be made to contact the parent of a pupil who is being suspended, the reason for the

suspension stated, and the parent informed that the notice of suspension has been sent to him by U. S. mail. If the parent cannot be contacted, the pupil is NOT to be sent home during the school day.

After any suspension from school it is advisable that the principal determine the extent of follow-up procedures to be taken to assure the rehabilitation and progress of the pupil.

2. Additional 30-Day Suspension

Only the Superintendent of Schools has the authority to suspend a pupil from school for more than 10 days.

If more than a 10-day suspension is deemed necessary, the principal may request an additional 30-day suspension (total 40 school days). This request for an additional 30-day suspension shall be prepared in triplicate on Form 39: *Request for 30-Day Suspension* and the original and one copy sent to the district office for the superintendent's study, concurrence, and signature. This request must include justification for the recommended action. If approved by the district superintendent, the original copy must be sent to the Supervisor of Attendance Services, Pupil Personnel Services Department, within a 3-day period of the initial 10-day suspension in order to have time to process the request before the expiration of the initial 10-day suspension. The district superintendent and the school principal shall each retain a carbon copy of the request.

The principal has the responsibility to notify immediately the appropriate police department and the School Security Department at the time of the incident described in the request for the suspension, if this action is warranted.

Rev. eff.: 8/18/69
13"

*Elementary and Secondary*

Suspension, Expulsion, Exclusion, Juvenile Court and Protective Services Referrals

2. Additional 30-Day Suspension (cont.)

At the time a pupil is recommended for a 30-day suspension by the principal and the district superintendent, they shall also recommend whether or not the pupil shall have the opportunity to attend a Center for Special Instruction during the suspension period. On approval of the 30-day suspension by the Superintendent of Schools, he shall notify the parent by certified mail of the suspension and the basis for the action taken. The Superintendent's letter shall state also if the pupil's attendance at a Center for Special Instruction is approved. Copies of this letter are forwarded to the district superintendent and the principal.

At this time the school shall file in the pupil's cumulative guidance record Form 39: *Request for 30-Day Suspension* and a copy of the letter of the Superintendent of Schools to the parent. A brief narrative comment of the suspension should be noted in section 9 of the cumulative guidance record.

There shall be no evidence of the 30-day suspension posted on the pupil's permanent record except that which is reflected by the pupil's attendance record.

3. Early Termination of 30-Day Suspension

The principal, with the concurrence of the district superintendent may request an early termination of a 30-day suspension.

If there is sufficient reason to request an early termination of the 30-day suspension, the principal shall prepare in triplicate Form 39a: *Request for Termination of 30-Day Suspension*, sending the original

and one copy to the district superintendent.

If the district superintendent concurs with this action, he signs the original copy of Form 39a and forwards it immediately to the Supervisor of Attendance Services for the attention of the Superintendent of Schools. If the Superintendent of Schools approves this early termination of the 30-day suspension, the parent is notified by letter, with a copy to the principal and district superintendent. The Supervisor of Attendance Services, or a delegated visiting teacher, notifies the principal immediately in order to expedite the early return of the pupil to school. The parent will also be notified by a visiting teacher, if the principal requests this service.

The copy of Form 39a and the principal's copy of the letter to the parent shall be filed in the pupil's cumulative guidance record and a notation made in section 9 on the cumulative guidance record as to the date of the early termination of the suspension.

Rev. eff.: 8/18/69
13"

4. Expulsion

Only the Board of Public Instruction, by law, has the right to expel a pupil from school.

Reasons for recommending that the Superintendent of Schools requests the Board to expel a pupil from school may be because of:

a. Having, using, or handling substances that modify mood and/or behavior;

b. Bringing to school or having in his/her possession a deadly weapon, including but not limited to a gun, knife, razor, explosives or ice pick;

c. Being involved in a serious breach of conduct such as an assault on school personnel or another pupil;

d. Lewd or lascivious behavior, arson or serious vandalism;

e. Other serious instances or misbehavior;

f. Less serious but continuing misconduct.

In making a request for expulsion, the principal shall prepare in triplicate Form 39: *Request for 30-Day Suspension* and follow the same procedure as in requesting a 30-day suspension. The principal must have issued a 10-day suspension, prior to submitting Form 39.

When a principal recommends the expulsion of a pupil from school for less serious but continuing misconduct, item f. above, in addition to the data included in Form 39, he must prepare a letter addressed to the Superintendent of Schools with detailed information about the pupil regarding:

a. Attendance, conduct and suspension;

b. Number of times the pupil has been seen by the visiting teacher, counselor, or other school resource personnel;

c. Curriculum adjustments made;

d. Number of times the parents have been involved in the pupil's adjustment problems;

e. Other measures taken by the school to bring about a change in the conduct of the pupil.

Rev. eff.: 8/18/69
13"

This letter forwarded to the Supervisor of Attendance Services will be made available to members of the hearing committee, pupil's parents, and to School Board members as part of the background information for the recommended action for expulsion.

At the time a pupil is recommended for expulsion by the principal and district superintendent, they shall also recommend whether or not the pupil shall have the opportunity to

attend a Center for Special Instruction. If expelled by the Board of Public Instruction and approval is granted to attend a Center for Special Instruction, the pupil will be notified of his eligibility through a letter to the parents issued by the Supervisor of Attendance Services.

The school shall file in the pupil's cumulative guidance record Form 39: *Request for 30-Day Suspension* and the official notice of expulsion from the School Board office. A narrative comment of this action should be noted in section 9 of the cumulative guidance record.

There shall be no evidence of the expulsion posted on the pupil's permanent record except that which is reflected by the pupil's attendance record.

5. Release from Compulsory School Attendance: Exclusion

The Supervisor of Attendance Services has the responsibility for approving the joint request of the principal and the district coordinator of pupil personnel services for the withdrawal from school of a pupil of compulsory school attendance age.

Reasons for the release from compulsory school attendance may include financial, emotional, physical or other critical conditions which temporarily cause the pupil to become unable to take advantage of the school program.

If it becomes necessary to consider the withdrawal of a pupil of compulsory school attendance age from school and the parent is in agreement with this action, a request by the principal for this withdrawal shall be made to the district coordinator of pupil personnel services. This request shall include:

a. The principal's statement of the problem;

b. A copy of any psychological or medical evaluation and recommendations;

c. A written request or agreement of the parent for withdrawal;

d. A statement from any school support services or nonschool professionals familiar with the case;

e. A report on any measures taken by the school to bring about the proper conduct and school progress;

f. Suggested plans which may insure the pupil's early return to school.

Rev. eff.: 8/18/69
13"

If the pupil's withdrawal seems warranted, the district coordinator of pupil personnel services shall forward this request with an appropriate cover letter to the Supervisor of Attendance Services for approval. The Supervisor of Attendance Services shall notify the principal of the disposition of the case by letter and at the same time send a copy of the letter to the district coordinator of pupil personnel services. The principal then notifies the parent or guardian of the action taken.

The letter of notification from the Supervisor of Attendance Services shall be filed in the pupil's cumulative guidance record. A narrative comment of this action should be noted in section 9 of the pupil's cumulative guidance record.

The permanent record should bear a notation of withdrawal as of a certain date.

6. Juvenile Court and Child Protective Services Referrals

The Juvenile Court has asked the office of Attendance Services, Pupil Personnel Services Department and the office of the Security Department to act as the only agents in bringing to its attention any case involving a pupil who commits a violation of law or is in conflict with the school law or regulations in that he is an incorrigible child or a persistent truant from school. Child

Protective Services of Dade County also ask that the above offices be the only agents in bringing related school problems to its attention.

When a child is in violation of Florida Statutes, the Security Department should be involved immediately.

The principal or assistant principal requesting that a particular pupil be brought to the attention of the Juvenile Court or Protective Services should consult with the visiting teacher and appropriate school personnel prior to making the formal request. If a referral is requested because of a school situation, the principal of that school must write a letter to the Superintendent of Schools requesting proper agency action. The original letter and one copy is sent to the Supervisor of Attendance Services and a second copy is sent to the district coordinator of pupil personnel services. The principal's copy of the letter to the Superintendent of Schools requesting agency action is to be filed in the pupil's cumulative guidance record.

Rev. eff.: 8/18/69
13"

A court letter must include pertinent information regarding the pupil, including a description of the attitude of the pupil, general conduct, progress in his school work, the attitude and cooperation of the home, and any other information which may be of help in explaining the situation to the court. If the referral seems to be an attendance problem, the dates and reasons for the absences during the entire school year should be specified. This information is most important in presenting the case in court. A Protective Services letter must show dependency, neglect or abuse as a basis for the referral. In any case valid supporting evidence is necessary regarding proof of any statement of charges. A representative of the referring school is to be present at the hearing before the judge when requested.

7. Confidential Report on Pupils Suspended, Expelled and Excluded

A confidential listing, for school personnel only, shall be compiled and released routinely by the office of Attendance Services, giving the names of all students currently on 30-day suspension, expulsion or exclusion. A limited number of these reports will be sent to district offices, to all school centers and to certain county administrators.

Rules approved: 12/7/66
Effective: 12/7/66
Rev. eff.: 2/8/68; 8/18/69

## APPENDIX III

*Objectives of the Instructional Program*

Guidelines for Instruction Pertaining to the Flag, Pledge of Allegiance, and National Anthem

The flag, the pledge of allegiance to the flag, and the national anthem are important symbols of the democratic heritage of the United States.

The public school system is one of the major social institutions responsible for the transmission of our democratic heritage to present and future generations. In fulfilling that responsibility, each school through its instructional programs and activities will provide a knowledge of—and encourage respect for—the important symbols of our Nation.

Board policy, Florida and federal statutes, and court decisions provide the bases for the following guidelines to be observed by each school in carrying on instructional activities in regard to the flag, pledge of allegiance, and the national anthem.

1. Teachers will direct their instructional efforts toward understanding patriotism and appreciation of freedom in our country.

2. The essentials of the United States constitution and flag education, including proper flag display and flag salute will be taught in all schools.

3. Students will stand at attention when the national anthem is played.

4. In pledging allegiance to the flag, the following pledge will be used: "I pledge allegiance to the flag of the United States of America and to the republic for which it stands, one nation under God, indivisible, with liberty and justice for all."

5. The pledge of allegiance will be rendered by standing with the right hand over the heart. Full respect to the flag will always be shown when the pledge is given by merely standing at attention, males removing the headdress.

6. Students, who for religious or other deep personal conviction, do not participate in the salute and pledge of allegiance to the flag will stand quietly.

 A. The staff will counsel with students who do not participate in the pledge and flag salute. Parents are to be contacted to determine the reason for the student's behavior. The main purpose for counseling would be to assist students in understanding our democratic heritage and in respecting the rights of all citizens.

 B. Students not participating in the pledge and salute to the flag who interfere with others doing so will be considered disrespectful. Any gestures, words or actions other than those officially prescribed above will be considered interference with the rights of others and disrespectful. In those instances where interference or disrespect occur, the school staff will take appropriate disciplinary action.

Legal Reference: Florida Statutes 233.-061, 233.065, Board Policy 6121(9); U.S.Laws 1965 c. 65–239, #34, eff. July 1, 1965; West Virginia State Board of Education et al. v. Barnette et al., reported in 319 U.S. 624, 63 S. Ct. 1178, 87 L.Ed. 1628

 DADE COUNTY SCHOOL BOARD
Miami, Florida

Policy adopted: 12/10/69
Effective: 12/10/69
17"