**Virchus TILLMAN et al., Plaintiffs,**

**v.**

**DADE COUNTY SCHOOL BOARD, a body corporate and politic under the laws of the State of Florida, Defendant,**

**The State of Florida and the Florida State Board of Education, Intervenor Defendants.**

**No. 70–699–Civ–TC.**

United States District Court,
S. D. Florida.

June 8, 1971.

Sally Weintraub, Legal Services Program, Inc., Miami, Fla., for plaintiffs.

Bolles, Goodwin, Ryskamp & Ware, Miami, Fla. (for Dade County School Board).

Robert L. Shevin, Atty. Gen., for State of Florida.

Rivers Buford, Jr., Tallahassee, Fla., for Fla. State Bd. of Education.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

CABOT, District Judge.

On June 7, 1971, the three-judge panel in this cause dissolved itself and re-manded to this court, the initiating court, the issues in the cause remaining for determination, i. e., the constitutional application of Florida Statute 232.26, F.S.A., to this case and the constitutionality of School Board Policy-Regulation #5114 on its face and as applied.

As noted in the three-judge opinion, 327 F.Supp. 927, the complainants in this cause are Black high school students who were suspended from South Dade High School by the school's principal acting pursuant to the authority granted him by Florida Statute 232.26, F.S.A. The suspensions were made following riots and disruptions which occurred on May 7 and May 8, 1970, on the grounds of the school and which were participated in by Black and White students alike and which were not substantially caused by students of any particular race.

CONSTITUTIONAL APPLICATION OF FLORIDA STATUTE 232.26, F.S.A.

On May 21, 1970, testimony was received by the court pursuant to the plaintiffs' application for a temporary restraining order. That testimony reflects that on the·morning of May 7, 1970, fighting broke out between White and Black students and spread soon thereafter throughout the school. The school's principal, recognizing the severity of the situation, sent for local police, began busing as many students home as possible, and in a further effort to quell the disturbance separated the Whites from the Blacks by moving the Whites in the direction they were heading, i. e., to the edge of and off campus, and by containing the Blacks on campus. On Friday, May 8, 1970, fighting again broke out and groups of students began roaming the halls inflicting extensive damage to school property, including smashed typewriters and over $3,000.00 damages to band instruments, and causing physical injury to other students. The testimony of school security guards establishes that some students were apprehended with items obviously intended to be used as weapons in the fighting, e.

g., a golf club and a cut-off pool cue. When classes resumed on Monday, May 10, 1970, a large force of school board security personnel together with a volunteer group of parents were on hand to insure the orderly operation of the school. The principal testified that throughout this period the situation at the school was chaotic, there was mass hysteria and terror on the part of many students, and that in his opinion the situation presented a danger to the community.

■ The plaintiffs have alleged that Florida Statute 232.26, F.S.A. was discriminatorily employed by the school's principal against Black students, relying upon the testimony received at the hearing on the application for temporary relief, as well as the suspension figures subsequently agreed upon by counsel. Those figures establish that 93 students were suspended by the principal (87 Blacks and 6 Whites), that 44 suspensions were subsequently lifted (39 Black and 5 White), that 48 of the remaining students received ten day suspensions and 16 of those were suspended for an additional 30 days. While it is true that when figures speak courts listen, Hawkins v. Town of Shaw, 5 Cir. 1971, 437 F.2d 1286. Brooks v. Beto, 5 Cir. 1966, 366 F.2d 1, it is apparent from a review of all the evidence in this case that the figures alone do not tell the whole story and consequently are not determinative of this issue.

The testimony of Principal Crabtree establishes that on May 7, 1970, his immediate and overriding concern was to separate the Whites from the Blacks in order to stop the fighting; that the Whites, under the guidance of the police, were moved out to the lower end of and off the campus. This was the area in which they had originally assembled and generally were headed toward. The Blacks were contained within the confines of the school plant under the supervision of both the school authorities and the school's security personnel. Principal Crabtree further testified that most of the suspensions issued were based upon a student's participation in the May 8 disturbances; that on that day the students, following an initial outbreak of fighting, were again separated, with the Whites going to the areas they occupied on May 7, and the Blacks again remaining on the school's grounds. It was on that day, May 8, that school authorities recognized the need and difficulty of identifying students involved in the disturbances and began taking photographs as a method of identification. However, the pictures were taken only on the school grounds, the security of which was of primary concern to the authorities, and only of those students posing a threat to that security by roaming the halls and refusing to return to classes. The testimony does not reflect which race was initially responsible for the disruptions and in fact the parties have agreed that neither Whites nor Blacks were the substantial cause.

While the suspension figures taken alone seem to indicate much greater fault or participation by Blacks, this circumstance arises only because the Blacks were confined primarily within the school's boundaries, and they, unlike the Whites, were more easily subject to identification and apprehension for misconduct. The physical separation of Whites and Blacks proved to be an effective method to halt the spread of fighting. The fact that Blacks were apprehended and many more Blacks than Whites suspended was nothing more than a fortuitous circumstance, a result of their physical location. The record simply does not support the conclusion that the school's principal discriminated against the Blacks in exercising the authority vested in him by the statute.

## POLICY-REGULATION #5114

School Board Policy-Regulation #5114 sets forth certain guidelines to be followed by school authorities in suspending or expelling a student. Plaintiffs have challenged the facial constitu-

tionality of the regulation as it existed during May of 1970 and as amended in August of 1970, and the constitutional application of the regulation during the May disturbances.

■■ With respect to the regulation as amended August 5, 1970, it is clear that the matter is not properly before the court. The suspensions and expulsions in this case took place during the month of May and perhaps some in June of 1970. There is no indication that action was instituted against students subsequent to the effective date of the amendment nor are there any other circumstances presented to the court which present under the August amendment a "case or controversy" for consideration by this court. Moreover, if the court were to consider the constitutionality of the regulation as amended, a threshhold issue of exhaustion of administrative remedies would be presented since the amended regulation, unlike its predecessor, contains provisions for administrative review. The exhaustion of administrative review has been approved by this circuit in school disciplinary cases. Stevenson v. Board of Education, Wheeler County, Georgia, 5 Cir. 1970, 426 F.2d 1154.

With respect to the remaining issues, recent cases, interpreting old but good law, seem to have settled what was once subject to debate. In Banks v. Board of Public Instruction of Dade County, S.D. Fla.1970, 314 F.Supp. 285, the court recognized the requirements set forth in Dixon v. Alabama State Board of Education, 5 Cir. 1961, 294 F.2d 150, and adopted that decision insofar as it required a notice and hearing. The hearing must include the rudimentary adversary elements: that a student subject to suspension for misconduct be given specific notice of the charges, the names of witnesses with a summary of their testimony, and the opportunity to refute the charges by oral or written testimony. The Banks court held, however, that the hearing need not be held prior to the suspension. Recently, in Williams v.

Dade County School Board, 5 Cir. April 5, 1971, 441 F.2d 299, this circuit noted that Banks sustained the constitutionality of that section of School Board Policy-Regulation #5114 which allowed a ten day suspension by the principal without the benefit of a prior hearing, but distinguished it from a 30 day suspension where such summary action could not be justified. The court concluded that Williams should have been given a hearing which included the rudimentary adversary elements prior to the imposition of the additional 30 day suspension.

■ The only testimony before the court in this case was received at the time of plaintiffs' application for temporary relief, a time when school authorities had not completed their investigation and when suspensions imposed were for a ten day period only. It was not until the filing of the pretrial stipulation that the court was alerted that 16 students were suspended for an additional 30 days. The testimony, therefore, does not reflect whether the students were given a hearing and if so whether that hearing measured up to the standards set forth in Dixon and the later cases. Nevertheless, the parties have cured the silence of the record on these points by stipulating (1) that no information was furnished to the students named as plaintiffs here or their parents as to the identity of witnesses whose testimony was the basis for such suspensions, and (2) that while the parents of each student who was suspended had the opportunity to confer with Principal Crabtree that opportunity was not afforded until after the imposition of the suspensions. Williams makes it quite clear that those students who were suspended for the additional 30 day period were entitled to a hearing prior to their being suspended. The severity of the 30 day suspension compels this requirement and more likely than not, as was the case in Williams, the need for suspensions without a hearing lessened in the days following the disturbances.

*Dixon, Banks,* and *Williams* establish that all the students who were suspended were entitled to be given the names of witnesses upon whose testimony the suspensions were based and a summary of what that testimony would be. Basic notions of fair play compel this requirement in a riot situation where tension is high, actions are easily misunderstood, where misidentification is often a product of the attendant confusion, and where individuals may likely be accused of misconduct simply because of their association with an easily identifiable group.

While the policy-regulation is not void for its failure to specifically contain provisions for a hearing, *Banks, supra,* it nonetheless appears clear from the record that the students suspended for 30 days or more were not given the process that was due them and are therefore entitled to relief. Accordingly, it is

Ordered and adjudged that counsel for the parties shall confer and submit to the court within 20 days from the date hereof a proposed form of final judgment in accordance with the foregoing.