**Curtis DUNN, Next Friend of Robert Dunn and Ronald Dunn, Minors, Loyce E. Allen, Next Friend of Reginald D. Allen, a Minor; for themselves and all other persons similarly situated,**

v.

**TYLER INDEPENDENT SCHOOL DISTRICT et al.**

**Civ. A. No. 5285.**

United States District Court, E. D. Texas, Tyler Division.

May 27, 1971.

Ken T. Miller, Tyler, Tex., for plaintiffs.

Marshall Spivey, Donald Carroll, Tyler, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

JUSTICE, District Judge.

Plaintiffs bring this action under the provisions of Title 42, U.S.C.A. § 1983, and Title 28, U.S.C.A. § 1343, as next friends for certain black students at

John Tyler High School[1], to enjoin defendants from preventing these black students from attending classes at John Tyler or from instituting disciplinary action against them because of a "walkout" of black students on March 24, 1971.

The events leading up to this walkout center around high school cheerleader elections held on March 23, 1971. These elections were held some seven months after the entry of an order of this court attempting to establish a unitary school system for the Tyler Independent School District. As a result of this order, the one previously all-black high school in the city of Tyler was closed, and the black students were assigned to two predominately white high schools, one of which was John Tyler. Some amount of friction between white and black students was evident at John Tyler throughout the school year. As a consequence, the principal of John Tyler, after consultation with the sponsor for cheerleaders, drew up a ballot prescribing that students were to select two black cheerleaders from a list of four black candidates and four white cheerleaders from a list of ten white candidates. The ballot identified black and white candidates under separate headings. At the time of the election, black students constituted approximately 38% of the student population at John Tyler.

Some amount of protest from black students was voiced prior to the election, because of the form of the ballot. This became more vocal on the day of the election, reflecting the desire of some black students for an equal number of cheerleaders with white students.

Meetings between several groups of black students and school officials were conducted throughout the day of the election, culminating in the gathering of some 250 to 300 black students in a campus theater close to the end of the school day. This meeting was for the purpose of apprising black students of the result of a conference between school officials and representatives of the black students as to the election. The assembled black students were informed that no change in the election procedure would be forthcoming. A subsequent meeting among representatives of the black students, the principal, and a Tyler Independent School District administrative official allowed black students an opportunity to further air their complaints, but no decision was reached.

While these meetings were continuing, assorted forms of vandalism took place within some school buildings. This included the setting of several small fires in waste paper baskets and student lockers. The identity of the vandals was not established.

On the evening of March 23, 1971, at a regularly scheduled meeting of the school board of the Tyler Independent School District, school district administrative officials and the principal of John Tyler discussed the events of the day and·again decided to maintain the election policy as established. While not stating their approval for the record, this decision was made in the presence of the school board and received their tacit approval.

Students and parents were not permitted to discuss this matter before the school board that evening. The next morning, however, they were informed that they would be permitted to bring their complaint to the board at its next regular meeting. They were, in fact, told that this was a necessary next step to the exhaustion of their available administrative remedies.

On the morning of March 24, 1971, upon learing that no change in the election policy was forthcoming, black students, numbering between 250 and 300, peacefully left the school buildings and gathered around the flag pole on the campus. This gathering began before classes were scheduled for most students, although some students were already in attendance in class. After the 8:35 a. m. bell signaling the beginning

1. Hereafter called "John Tyler".

of the second period class, a black vice-principal ordered the gathered students to either return to classes or to leave the school grounds. This ultimatum was delivered after futile attempts by this vice-principal to persuade the black students to follow appeal procedures before the school board. Most black students then moved from the campus to vacant land across the street from where they had been gathered. This gathering soon dispersed.

It is apparent that several distractions were occasioned by the assembly of black students at the flag pole. Throughout the day some students, both white and black, continued to leave campus for various reasons. Black students who subsequently tried to return to school on March 24th, whether or not known to have participated in the walkout, were denied readmission.

The following day, March 25, 1971, it was the policy of school officials at John Tyler to readmit only those students with valid excuses for absence on the preceding day. A delegation of parents of black students was received by the principal but told that readmission could only be accomplished through individual meetings between parents and school officials. It was the position of the principal that the students who left on the morning of the 24th were not suspended from school, but were "excluded" from attendance pending investigation of the incident and personal interviews with parents and students to determine if suspension would be in order. Subsequent contacts between parents of black students and school officials and school board members did not achieve further review of the matter. White students, however, who had been absent without excuse on March 24, 1971 were readmitted without being subjected to this procedure. For most, readmittance came after their parents telephoned school officials to explain their child's absence.

The procedure for readmission to classes for "excluded" black students, which began on Sunday, March 28, required each student and his parents to meet with a school official for an individual interview session. At each such interview, the student was interrogated as to his own actions and the participation of others in the walkout. For those few black students who submitted to this procedure, the invariable result was a further suspension from school for three days, together with probation for the remainder of the school term. No effort was ever made, however, by school officials to comply with the requirements for suspending students contained in the Policy on Student Behavior promulgated by the defendant school district.[2] For

2. *Suspension and Reinstatement of Pupils*
   1. A pupil who is subject to suspension may be excluded by the principal for a maximum of three (3) school days. The principal or his assistant must notify the parent or guardian of the suspension before the pupil leaves school. In the event the parent cannot be reached, the pupil will remain at school until the end of the school day, at which time he will be allowed to go home. The principal will:
      a. Advise the pupil of the exact nature of the charge that is being lodged against him.
      b. Advise the pupil of the policy or law that he has been charged with violation.
      c. Advise the pupil as to the nature of the penalty and its effect.

      d. The principal will contact the parent or guardian before the beginning of the next school day. A suspension will not become effective until the parent or guardian has been notified. However, in case the parent or guardian has not been contacted after diligent effort by the principal, the suspension will become effective when the pupil leaves school at the end of the school day. Continued efforts will be made to contact the home.
   2. The principal may reinstate a suspended pupil after a conference with the parent or guardian and when he is assured that the pupil will conform to the school regulations.
   3. If the suspension period is for an indefinite period of time, or a period

those black students who did not comply with the interviewing procedures, the "exclusion" was indefinite and would have continued until these students and their parents submitted to the interview procedure already outlined.

Plaintiffs assert that the conduct of the defendants in either preventing the black students from returning to school or in subjecting them to disciplinary action if they were allowed to return was violative of their First Amendment rights of free speech and assembly.

■■■ It is evident that First Amendment rights to "freedom of speech * * * [and] the right of the people peaceably to assemble, and to petition the Government for a redress of grievance", are held by minors as well as adults, and that these rights must be respected by governmental authority even in the context of the educational environment. *Tinker v. Des Moines Ind. Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Minors in school as well as out of school are recognized as "persons" under the constitution and are thereby possessed of fundamental rights which the state must respect. *Tinker*, supra, at 511, 89 S.Ct. 733; *See* generally In re

---

in excess of three (3) school days, the following procedures shall apply:

a. The student and his parent or guardian must be notified in writing of the reasons for suspending the student and a prompt hearing at the school must be arranged if requested by the student or parent or guardian. The student and his parent or guardian shall be furnished with a copy of the suspension procedures.

b. A student or his parent or guardian who desires to be assisted at the hearing or any disciplinary proceeding may be accompanied by an adult person who may represent and assist him in the proceedings. If a parent or guardian is unable to attend, he may designate an adult to represent the student. The Tyler Independent School District may require evidence of the appointment of any such representative.

c. If substantial evidence is presented at the hearing which, in the judgment of the principal, warrants suspension for a substantial period of time, he shall inform the student and parent or guardian of the decision not to reinstate the student and apprise the student and parent or guardian of the right to appeal the decision to the appropriate administrative assistant.

d. Any student or his parent or guardian who wishes to appeal shall notify the principal in writing of his intention to appeal. The principal shall immediately notify the administrative assistant who will arrange a time for hearing the appeal. Such notification to the administrative assistant shall include or be immediately followed by a letter from the principal containing a complete description of the student's conduct, including all offenses and dates, any pertinent supplemental information and a recommendation for disposing of the case. The administrative assistant shall notify the student and the parent or guardian of the time and place of the hearing. The hearing shall be held within seven days from the date the student or parent or guardian notifies the principal of his intention to appeal, unless the parent or guardian agrees to an extension.

e. At the hearing on appeal, the administrative assistant shall confer with the principal and the student and his parents or guardian and determine whether the student shall be suspended for more than three (3) school days or be reinstated.

f. If suspension in excess of three (3) school days is sustained on the basis of substantial evidence presented at the hearing, the administrative assistant will forward the pertinent information to the superintendent who will review the facts and confirm or reverse the decision.

g. The student or his parent or guardian may appeal the decision by school administrative officials to the Board of Trustees.

Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L. Ed.2d 527 (1967). But while school officials do not possess absolute authority over their students, they do have comprehensive authority to prescribe and control conduct in the schools. *Tinker,* supra, 393 U.S. at 507, 89 S.Ct. 733. They have important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the fundamental rights of the students. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943). Accordingly, school officials may not entirely prohibit speech and speech related activity but may only promulgate regulations which forbid conduct relating to such activities that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school."

> [C]onduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others, is of course, not immunized by the constitutional guarantee of freedom of speech.

*Tinker,* supra, 393 U.S., at 513, 89 S.Ct. at 740.

It is by this standard that the regulation by which the defendants seek to discipline the "excluded" black students must be judged. The pertinent language of this regulation states that

> [a]ny student who participates in a boycott, sit-in, stand-in, walk-out or other related forms of distraction * * * shall by this action be subject to automatic suspension from school.

■ The defendant's interest in preventing substantial disorder and material disruption of classroom activity is, of course, of such compelling interest as to justify reasonable regulation. This, however, does not mean that any such rule propounded by the defendants

would be impervious to constitutional attack. New Left Education Project v. Board of Regents, 326 F.Supp. 158 (W. D.Tex.1970—3 judge court). It is quite clear that

> even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed. 231 (1960); See Hiett v. United States, 415 F.2d 664 (5th Cir. 1969), cert. denied 397 U.S. 936, 90 S.Ct. 941, 25 L.Ed.2d 117 (1970). Precision of regulation is essential since the state may regulate in this area only with narrow specificity, NAACP v. Button, 371 U.S. 415, 83 S. Ct. 328, 9 L.Ed.2d 405 (1963).

■ The regulation in issue here fails in this particular, since it arbitrarily prohibits all boycotts, sit-ins, stand-ins, and walk-outs without limiting its proscription to such activities involving misconduct or those which present a material and substantial disruption of the educational environment. Hammond v. South Carolina State College, 272 F. Supp. 947 (D.S.C.1967), cited with approval in *Tinker,* supra, 393 U.S., at pp. 512 and 513, 89 S.Ct. 733. In *Hammond,* District Judge Hemphill had before him a case involving a meeting on campus of 300 students to express their views on school practices. All of these students were subsequently indefinitely suspended, because of their breach of a resolution of the school's Board of Trustees which states:

> Be It Resolved that hereafter any student at South Carolina State College who shall engage in any public demonstrations without prior approval of the college administration shall be summarily expelled.

In declaring such prohibition to be "incompatible with the guaranties of the First Amendment", Judge Hemphill ob-

served that the resolution in question was

> on its face a prior restraint on the right to freedom of speech and the right to assemble. The rule does not purport to prohibit assemblies which have qualities that are unacceptable to responsible standards of conduct: it prohibits 'parades, celebrations, and demonstrations' without prior approval without any regard to limiting its proscription to assemblies involving misconduct or disruption of government activities or non-peaceable gatherings. On this ground I do not feel that it is necessary to make a finding as to the nature of the demonstration.

Manifestly, the rule presently before this court goes much beyond the prohibition in *Hammond*. There, such speech related activities were prohibited until approved by the school administration. The John Tyler rule, however, flatly prohibits all such activities regardless of their character.

It is apparent that all such activities are not materially and substantially disruptive *per se*. Even in the context of the educational environment, such speech-related activity, while traditionally subject to greater regulation of time, place and manner than is pure speech, see Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 466, 476, 13 L.Ed.2d 487 (1965); Cameron v. Johnson, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), cannot be completely prohibited. Free speech cannot be a right that is given only to be so circumscribed that it exists in principle but not in fact. To hold otherwise would be to limit a student's free speech rights to passive, muted, symbolic protests, or to so restrict such rights to inappropriate settings as to make an exercise of those rights ineffectual. See Graves v. Walton County Board of Education, 410 F.2d 1153 (5th Cir. 1969). Neither may the state penalize students for the proper exercise of their free speech rights.

> [D]iscipline for truancy or *for any other wrongdoing* cannot be made an instrument of racial discrimination or imposed for asserting a constitutional right or privilege. [Emphasis added.]

Woods v. Wright, 334 F.2d 369 (5th Cir. 1964).

The Supreme Court has continually recognized the value of freedom of speech within the context of the American school. In Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967), the court said:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools. The classroom is peculiarly the 'market place of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'

Two years later in *Tinker*, the court reaffirmed its belief that this principle is not confined to the supervised and ordained discussion which takes place in the classroom.

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects * * * if he does so without 'materially and substantially interfer[ing]

with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others. *Tinker*, supra, 393 U.S., at 512, 513, 89 S.Ct. at 739.

Thus, while the defendant can certainly prohibit disruptive activity in the nature of boycotts, sit-ins, stand-ins, and walk-outs that materially interfere with the educational environment, they must do so in a manner that strikes at the very evil they wish to prevent rather than making all such activities *per se* illegal. Applying this principle to the case at hand, it is apparent that this regulation is unconstitutionally overbroad.

■ The regulation in question is also fatally defective in that its standard of "distraction" does not comport to the proper standard by which to judge speech-related activity in the context of the educational environment. As noted before, such activity may be prohibited only if it "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school" Tinker v. Des Moines Ind. Community Sch. Dist., supra; Burnside v. Byars, 363 F.2d 744, 749 (5th Cir. 1966). To base regulation of speech on "distraction" would be to limit free speech only to those matters of such slight importance that no one is stirred to make a response upon hearing such speech. Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1131 (1948); Gregory v. City of Chicago, 394 U.S. 111, 89 S.Ct. 946, 22 L.Ed.2d 134 (1969).

■ Vagueness of another kind is also an inherent weakness of this regulation, there being no way to determine when the regulation is to be applied. This is a critical aspect of this particular case, since the defendants are alleging that the plaintiffs were, in fact, never really suspended but were only voluntarily out of school. The regulation specifies that participants in such prohibited activity shall be "subject to automatic suspension". This language indicates no standard by which to judge when suspension will be "automatic" and when it will be "subject to" the discretion of school officials. This latter proposition allows the school officials "unbridled discretion" to determine which boycotts, sit-ins, stand-ins, or walk-outs are not subject to suspension and which participants in such activities are thereby free from the threat of suspension. See Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L. Ed.2d 162 (1969). Regulations cannot be allowed to stand when they make enjoyment of First Amendment freedoms contingent upon the will of an administrator. Staub v. City of Baxley, 355 U. S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); New Left Education Project v. Regents, supra.

■ Apart from the issue of the constitutionality of the above-stated rules, plaintiffs would be entitled to the relief they are seeking, because of the failure of the defendants to comply with the procedural due process requirements of the Fourteenth Amendment. Within the past month, the Court of Appeals for the Fifth Circuit has recognized the danger inherent in any lengthy suspension of high school students. Recognizing the importance of education in contemporary society, see Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the court held a 30 day suspension to be more than a "mere administrative device utilized to remove unruly students at a particularly tense period." Rather, the court held such a sanction to be a tantamount to the loss of a full term and of such importance as to require notice and hearing. Williams v. Dade County School Board, 441 F.2d 299 (5th Cir. 1971). The court there extended to high school students the same procedural due process rights it granted to college students ten years earlier. Dixon v. Alabama State Board

of Education, 294 F.2d 150 (5th Cir. 1961).

The case now before this court clearly falls within the scope of the *Williams* decision. The black students who were not permitted to return to classes after March 24, 1971, were, as of that day, under an indefinite suspension regardless of the label employed by the defendants to classify their absence. It is evident from the evidence presented that no procedure was even being contemplated by the defendants to receive these black students back into school. A penalty of this magnitude must not be imposed without proper notice and hearing, conforming to the requirements of *Dixon* and *Williams*, supra.

No attempts, however, was made to comply with the requirements of these cases. Neither students nor parents were ever notified of the reasons for the students' suspension or of the procedure for readmission. The interview procedure used by the principal of John Tyler High School did not comport to the hearing with "rudimentary adversary elements" specified by *Dixon* and *Williams*. No notice of charges were given. Neither were the names of witnesses with a summary of their testimony provided, so as to give the person involved an effective opportunity to refute the charges against him.

Accordingly, it is the order of this court that the motion of the plaintiffs for the issuance of a preliminary injunction be, and it is hereby, granted. It is further

Ordered that the defendant refrain from instituting or executing any disciplinary action against the black students prohibited from returning to school on March 25, 1971. It is further

Ordered that all records of disciplinary action appearing on the permanent records of any of these students relating to the incidents referred to in this opinion be expunged from such records.