Curtis DUNN, next friend of Robert Dunn and Roland Dunn, Minors, et al., Plaintiffs-Appellees,

v.

TYLER INDEPENDENT SCHOOL DIS-TRICT et al., Defendants-Appellants.

No. 71-2395.

United States Court of Appeals, Fifth Circuit.

April 11, 1972.

Rehearing and Rehearing En Banc Denied June 12, 1972.

Marshall Spivey, Donald Carroll, Wilson, Miller & Spivey, Tyler, Tex., for defendants-appellants.

Ken T. Miller, Jr., Tyler, Tex., for plaintiffs-appellees.

Before RIVES, AINSWORTH and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge:

On Wednesday, March 24, 1971 from 250 to 300 black students of John Tyler High School, Tyler, Texas, participated in a mass action which began as a before-class assemblage on the school grounds and evolved into a boycott or refusal to attend classes. For simplicity, we refer to it as a walkout. School officials began disciplinary measures against the participants. Black students filed this suit on Tuesday, March 30, and that same day the District Court granted a temporary restraining order against school officials, restraining them from refusing to readmit any black students who participated in the assemblage on the school grounds, from requiring any such student to undergo readmission procedures or to undergo any form of interrogation concerning his role in the assembly, and from in any manner disciplining or discriminating against any student by reason of his participation. Approximately a month later, on April 28, after a full hearing, the court orally announced preliminary findings of fact and conclusions of law

and stated that an injunction would be granted. On May 28, an opinion was filed [1] and the injunction entered, forbidding any disciplinary action against participants and ordering that any entries of disciplinary action appearing on their permanent records be expunged.

Now, a year later, it appears that everyone—school officials, black students, and District Court—was wrong to some extent.

### 1. The facts

It is necessary that the facts be fully set out. The evidence, largely undisputed, reveals the following. In the 1970–71 school year Tyler was a newly integrated high school, approximately 62% white and 38% black. A substantial number of the blacks had been transferred to Tyler from Scott, a black high school. There was some black-white friction during the year. The walkout arose over selection of cheerleaders for the 1971–72 school year. For the 1970–71 year, two of those already chosen at Scott were transferred to Tyler and became members of the Tyler squad, and a third black was appointed on the recommendation of the teacher who had been sponsor of the squad at Scott. Beginning with the 1971–72 squad, all cheerleaders were to be chosen by election. As a transitional device and to insure against only whites being elected by bloc voting, Principal Hanna directed that four whites be chosen from ten white candidates and two blacks from four black candidates, the four-two ratio approximating the ratio of white and black students. The principal planned that for 1972–73 there would be an unrestricted election.

On the morning of Tuesday, March 23, all candidates participated in tryouts before the student body, and the election was held immediately thereafter. During that morning black students began to express dissatisfaction, in part because blacks and whites were separately listed and identified on the ballot, but

1. Dunn v. Tyler Independent School District, 327 F.Supp. 528 (E.D.Texas 1971).

chiefly because the positions were not equally divided between whites and blacks. School officials responded to their desires for meetings and for discussions at which they could air their complaints. A small group came to see Hanna, another to see Vice-Principal Anderson, a black. The latter group desired a meeting with Hanna, and Anderson arranged it for the early afternoon. At the appointed time approximately 125 to 150 black students assembled in the hall outside the principal's office. Hanna considered this assemblage to be a serious matter, since the arrangement had been for him to meet with a small group. However, after urging and persuasion by school officials and after being informed they would get a decision on what they felt to be a grievance, the students dispersed and went to their classes. Hanna and Anderson then met with a delegation composed generally of the two groups that had been in the separate morning meetings.

At these meetings the students voiced a desire for an equal number of black and white cheerleaders. Hanna explained his reasons for the four-two ratio and told the group that if the designation of "black" and "white" on the ballots offended them it was an error of judgment on his part to so label the groups. In at least one of the meetings he suggested that a new ballot be prepared listing all candidates alphabetically and that a new election be held the next day. The black students found this unacceptable, recognizing, as one of them testified, that it might result in selection of only whites. Hanna left his decision in effect but suggested that if they were dissatisfied they discuss their complaint with Administrative Assistant Lindsley.[2] They desired to do so, and Lindsley came to the school. Black students were excused from classes and other activities to attend a meeting in the early afternoon, and approximately 400 came. It was Anderson's opinion that had this meeting not been arranged the

blacks would have refused to attend classes.

Lindsley met with student representatives and also spoke to the larger group. He agreed that Hanna's decision should remain in effect. Anderson did most of the talking to the assembled students. One or more students spoke, urging an equal number of black and white cheerleaders, and the group supported that view. School officials at the meeting recognized that tensions were rising. Lindsley told the group that he would discuss the matter informally with the School Board, which was meeting that night. The students were told that there would be another meeting of black students the following morning before school in the gymnasium, at which they would be told whether the decision about the ratio had been changed.

Meanwhile other events had been occurring during the school day. A number of fires were set in waste baskets, lockers, locker rooms and rest rooms. A student and a teacher testified to smoke in the building. There was no conflagration, and the fire department was not called. Some books were damaged by fire, a poster was set afire, and papers strewn about in front of lockers. The identity of those who set fires was not established. However, one teacher testified to entering a locker area where black students were congregated, where he put out three fires in lockers, observed another teacher put out a trash can fire, and caught a student setting fire to a poster. He was sufficiently concerned that when still another teacher entered the area he asked him to remain, saying that he feared they might need help. As the black students left the afternoon meeting, an unidentified person in a group of blacks kicked in plastic panels in a hallway.

At the meeting of the School Board on Tuesday night, Hanna informally discussed the cheerleader problem with members. They appeared to support his position, but reminded him that Board

---

2. Apparently an administrative assistant for the entire school system.

policy was for the principal to handle problems such as this at the school level if possible.

The next morning, Wednesday, the preschool meeting was held in the gymnasium as scheduled. It was noisy, and some students were belligerent. Anderson spoke to the students and told them that unofficially the School Board backed Principal Hanna's decision. He urged the students to refrain from setting fires, to attend classes, and to avail themselves of appeal procedures by having their parents present their complaint in formal fashion to the School Board, which would consider it at the next meeting. The temper of the meeting was sufficiently high that Anderson would not allow students to use the microphone. Some students addressed the group without it.

When the meeting was over, approximately 250 to 300 black students peaceably assembled around the flagpole in front of the school. Hanna went out and spoke to individual students, encouraging them to go to classes. Anderson spoke to the group, urging them to go to classes and to follow the procedure for appeal to the School Board. When the bell rang for classes and the students did not disperse, the principal telephoned, presumably to School Board offices, to secure authorization to tell the students to go to classes or to go home. Having obtained that authority, Hanna asked Anderson to convey this word to the students, and then by the intercom system he notified teachers to admit without question any student who appeared within the next 10 minutes. Anderson addressed the group at the flagpole, and told them to go to classes or leave the school grounds. A few came to classes, most dispersed and left the school grounds. Until after the time to go to classes there was no effort by school officials to prevent students from speaking or from using the assembly as a means of expressing their grievances.

The rest of Wednesday the school remained tense. School officials considered that if students who had left returned during the day they would either encourage to leave, or threaten, students who had remained at school. Various distractions occurred.[3] Students, black and white, left school for differing reasons, some because of previous parental instructions to come home in the event of racial difficulty at the school. A group of whites left to see what was happening and returned later in the day. Parents, black and white, came to school and got their children. The principal and two vice principals were in and out of their offices, circulating among the students who remained, reassuring them, and attempting to keep school running. They answered many calls from parents inquiring whether children should come home or remain at school.

On Wednesday night Hanna reached a decision on an approach for operating the school on Thursday, Friday and Monday. He planned for himself and other school officials to devote their full efforts on Thursday and Friday to attempting to restore the school to a normal operating condition, and, once that was done, then to undertake individualized handling, by interview with each student and his parent, of the cases of those who had participated in the walkout. He proposed to conduct school on Thursday with the students who had remained for classes on Wednesday, anticipating that no problems would arise from them and hoping that it would be a normal school day. In general, parents of students who had absented themselves without excuse on Wednesday but had not participated in the walkout were told to come back with their children on Friday for readmission. Beginning Thursday morning, announcements were made

---

3. One teacher testified to moving her class from one location to another, and then spending the class period calming black students in the classroom who were unsure of what to do, fearful of both joining and not joining the walkout.

by radio, television and newspapers that students who had participated in the walkout would be readmitted beginning on Monday but only after an interview of the student and his parent with school officials. The requirement of an interview by parent and child together, when a child was in difficulty with the school, was a long-established procedure of the Tyler school system.

In general, the proposed overall approach was carried out. On Thursday and Friday the principals again spent most of the time out of their offices, circulating around the school, seeking to avoid any recurrence of difficulty and remaining free in case there were any untoward incidents. The situation remained strained. There were a few additional small fires. During the day Hanna talked to a few white parents and met with a large delegation of parents of walkout participants. The latter group asked for immediate reinstatement of all those who had walked out, which Hanna refused. He explained the plan to conduct interviews. The parents expressed the fear that interviews would be used to search out ringleaders who would receive more severe punishment. They asked for a single mass interview of all affected children and parents, which Hanna declined.

By Friday substantially all students, black and white, who had been absent without excuse on Wednesday but were not participants in the walkout, had been readmitted.

Interviews were commenced on Sunday to accommodate working parents who could not conveniently come during the week, and officials interviewed all who came. Further interviews were conducted on Monday and Tuesday. A form had been prepared to guide the several interviewers so that all interviews would follow approximately the

same course. Also a card had been prepared, as follows:

JOHN TYLER HIGH SCHOOL

Date: ———————————

I, ——————————, upon being readmitted to John Tyler High School, understand and agree that I am on probation. Therefore, if I violate any school rules after this date, I will be subject to permanent expulsion for the remainder of the school year.

————————————————
Student's Signature

————————————————
Parent or Guardian's Signature

————————————————
Principal

Students required to have interviews as prerequisite to readmission were not given written notice of charges, a list of witnesses or a summary of the testimony against them. Each was permitted, in fact required, to have a parent present, but no mention was made of presence of counsel. The principal testified that each student interviewed was given the opportunity to present evidence that, although absent on Wednesday, he had not participated in the walkout, and that 20 or 30 presented reasonable evidence to that effect and were allowed to return to class. Approximately 125 who submitted to interviews were suspended, most of them for either two or three days, a few for only one day. Approximately 175 children, and their parents, declined to come for interviews, and, since the school considered the interview a prerequisite to readmission, these children were not readmitted.[4] Each student suspended was required to sign the above-quoted form.

On Tuesday the District Court entered its temporary restraining order, requiring immediate readmission of all participants without undergoing any procedure

4. From the foregoing figures, it appears that the record does not support the finding of the District Court that only a few students submitted to interviews and that the invariable result was suspension.

as a prerequisite, forbidding disciplinary action against them, and stopping the interviews. At the full hearing a month later the testimony was that since the students were readmitted there had been no further difficulty about the cheerleader question and no disruption in the school, and the briefs tell us that condition has continued. Testimony of some of the students at the hearing was that they intended to stay out of school until they had further opportunity to present their side of the dispute, of others that they intended to stay out of school until their demands were met.

### 2. The District Court decision

The subsequent decision of the District Court, entered after hearing, is based on several grounds: (1) the applicable school regulation is unconstitutional because it is overly broad and vague; (2) the school failed to comply with its own regulation concerning the manner of suspension; (3) the black students were not afforded procedural due process. Also, (4) the District Court considered the school officials wrong (presumably for one or more of the foregoing three grounds) in refusing to readmit participating students on Thursday, March 25, the morning after the walkout.

### 3. The offense and the regulations

■ The District Court's approach was that the conduct of the students was permissible and beyond the reach of action by school officials unless specifically covered by a valid regulation. This was error. The conduct of school affairs by those charged with it, and the

duties and responsibilities of students, are not necessarily wholly encased in written regulations. No student needs a regulation to be told he is expected and required to attend classes. State law requires attendance, in Texas as in almost all other states.[5] The entire structure of compulsory attendance, written "excuses" for absences, taking of the roll in classrooms, and penalties for truancy, is familiar to every child. There are grey areas of conduct for which the student needs the guidance of a regulation telling him what is allowable and what is not. But the basic requirement of attending classes does not fall in that area. Thus, wholly apart from the regulation, the school was authorized to act with regard to a mass refusal to attend classes.

■ However, approaching the matter in terms of the regulation,[6] as did the District Court, it is not overbroad insofar as it relates to "boycott" and "walkout," which are the two proscriptions arguably referable to this case. Those two terms are fully descriptive in common, everyday and well-known parlance of group activities inherently disruptive of the school's work, notwithstanding that there appears thereafter in the regulation the phrase "other related forms of distraction."[7] Reliance by plaintiffs and the District Court upon Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C. 1967), is misplaced. Hammond related to a regulation providing for summary expulsion of students "who shall engage in any public demonstrations without prior approval of the College administration." Id. at 949. Students who assembled on the campus to protest college

---

5. Tex.Educ.Code § 21.032.

6. It provides:
   "Any student who participates in a boycott, sit-in, stand-in, walk-out, or other related forms of distraction or who is involved in a threat of assault on school personnel or other pupils shall by this action be subject to automatic suspension from school."
   It appears in the school district's "Policy on Student Behavior," in the section

headed "Disorderly or Disruptive Conduct." The policy is distributed in pamphlet form to every student.

7. No contention can reasonably be made that in context the regulation purports to relate to conduct removed in time or space from school. The entire thrust of the section on "Disorderly or Disruptive Conduct" goes to protecting pupils, school property, school personnel, and the educational climate.

policies were suspended. Such an assembly or demonstration may be disruptive of the school's work, or it may be not at all disruptive, so that an overall proscription against all public demonstrations cannot stand. But *Hammond* had no relation to the inherent disruption of the classroom process by mass refusal of pupils to take part in the classroom process. In Tinker v. Des Moines Indep. Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed.2d 731 (1909), it was recognized that wearing of the armbands was "entirely divorced from actually or potentially disruptive conduct by those participating in it," 393 U.S. at 505, 89 S.Ct. at 736, 21 L.Ed.2d at 737, that the case "does not concern aggressive, disruptive action or even group demonstrations," that there was "no evidence whatever of petitioners' interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone," and "no indication that the work of the schools or any class was disrupted." 393 U.S. at 508, 89 S.Ct. at 737, 21 L.Ed.2d at 738.[8]

■ As an alternative ground for a finding of invalidity, the District Court considered that the regulation's phrase "subject to automatic suspension" gave school officials such unbridled discretion that the right to engage in first amendment conduct was dependent upon the will of an administrator, and thus the regulation was invalid under Staub v. Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L. Ed.2d 302 (1958). That case concerned standardless power of officials to grant or withhold licenses for solicitation of members, that is, unfettered discretion to make conduct permissible or proscribed at will. The concept of vagueness as an invalidating factor applies to the substantively protected activity and not to allowable ranges in enforcement measures that accompany the proscription. The possibility that the enforcing authority may impose less than the maximum, or remit punishment, or even elect not to pursue enforcement measures, does not invalidate the proscription of conduct; otherwise a goodly percentage of our criminal statutes would fall.

### 4. Failure to comply with regulations governing suspensions

We set out in the margin the school regulations concerning suspension of students for not more than three days.[9]

---

8. Our conclusion does not mean that there never can be circumstances under which the school's right to require classroom attendance may have to give way. But this does not invalidate the regulation for overbreadth. Professor Charles Alan Wright points out that "there is a very narrow gap, and a great danger of confusion, between the notion of the statute void for overbreadth and the statute valid on its face, though it might be unconstitutionally applied." Wright, the Constitution on the Campus, 22 Vand.L.Rev. 1027, 1067 (1969). "It is difficult to think of a law that is utterly devoid of potential for unconstitutionality in some conceivable application." Note, The Overbreadth Doctrine, 83 Harv.L.Rev., 844, 859n. (1970). It is a misuse of the overbreadth doctrine and its purpose to strike down a narrowly focused rule because it does not exclude every conceivable possibility under which there can be some minimally inappropriate effect or an invalid application. *Id.* at 859.

In addition, the regulation in issue is of a type calling for the least strict application of overbreadth scrutiny. It does not censor by preventing pupils from expressing their views on a matter of public concern, but only impinges on expressive conduct while neutral as to the viewpoint advocated by the conduct, and at the same time promotes institutional values which are within the concern of the first amendment (i. e., the teaching process of the school, the values of the institutional means by which the students were freely allowed to present their complaints, and other means available to them by formal presentation to the school board.) *Id.* at 918.

9. "*Suspension*
"When subject to suspension, pupils may be excluded by the principal not to exceed three (3) school days. Such a pupil may be reinstated by the principal when the principal is assured, after a conference with the pupil's parents

They provide that the principal may enter such a suspension without the formality of a hearing. He must tell the pupil the nature of the charge, the purpose of the policy or rule violated, and the nature and effect of the penalty. Notice must be given to the parent, but it may be after the imposition of the suspension, and the suspension is not effective until the parent is, if possible, notified. The pupil may be reinstated after conferences between principal, student and parent, at which the principal is assured the student will abide by school regulations.

On the other hand, if a suspension is indefinite or for more than three days a different procedure is provided by another regulation, with a hearing prior to imposition of penalty, written prehearing notice, representation for the student at the hearing if desired, and other somewhat formalized provisions necessary to meet due process requirements.[10]

■ The school officials considered that they were acting under the procedure for suspensions of three days or less, and, to the extent that they imposed penalties greater than three-day suspensions, we agree with the District Court that the regulations were not followed. Thus it was not proper to impose probation or the exposure to future permanent expulsion for violation of any other school rule.

The suspensions did not violate the governing regulation set out in footnote 9, *supra*,[11] and the regulations are constitutionally sufficient. Obviously school officials have available to them in day-to-day operation of schools a scope of summary punishment without even the limited type of hearing required in more serious circumstance. A principal does not have to serve written notice of the charge, a list of witnesses, and a summary of expected testimony in order to have a student "stay in" for an hour for running in the halls. See Farrell v. Joel, 437 F.2d 160, 162 (2d Cir. 1971). At the other end of the spectrum is exposure to more serious penalties, such as expulsion of a college student, Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U. S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961), and suspension for 40 days (eight school weeks), Williams v. Dade

---

or guardians, that they will conform to the school's regulations. A pupil who will not conform to the school regulations, may be referred to the superintendent, who may at his discretion refer the case to the Board of Education.

"*Suspension and Reinstatement of Pupils*

1. A pupil who is subject to suspension may be excluded by the principal for a maximum of three (3) school days. The principal or his assistant must notify the parent or guardian of the suspension before the pupil leaves school. In the event the parent cannot be reached, the pupil will remain at school until the end of the school day, at which time he will be allowed to go home. The principal will:

   a. Advise the pupil of the exact nature of the charge that is being lodged against him.

   b. Advise the pupil of the policy or law that he has been charged with violating.

   c. Advise the pupil as to the nature of the penalty and its effect.

   d. The principal will contact the parent or guardian before the beginning of the next school day. A suspension will not become effective until the parent or guardian has been notified. However, in case the parent or guardian has not been contacted after diligent effort by the principal, the suspension will become effective when the pupil leaves school at the end of the school day. Continued efforts will be made to contact the home.

2. The principal may reinstate a suspended pupil after a conference with the parent or guardian and when he is assured that the pupil will conform to the school regulations."

10. E. g., Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 368, 7 L.Ed.2d 193 (1961).

11. In fact, there was more than compliance. Rather than school officials imposing the penalty, telling the parent later, and then having an interview, the parents were brought into the picture from the beginning.

County School Board, 441 F.2d 299 (5th Cir. 1971). This in-between case of brief suspension is similar to Baker v. Downey City Bd. of Education, 307 F. Supp. 517 (C.D.Cal.1969), in which informal conference with parents was held constitutionally sufficient to support a 10-day temporary suspension. See also Banks v. Board of Public Instruction of Dade County, 314 F.Supp. 285 (S.D.Fla. 1970, 3 judges), sustaining the constitutionality of application of Florida statute and regulations providing for a 10-day suspension with notice after the fact to parents and an invitation to them to come to school for an interview if they wish. In Williams v. Dade County School Board, *supra*, this circuit recognized *Banks* and distinguished its 10-day suspension from stacked suspensions of 10 plus 30, or 40 days, which we considered to be "serious punishment." The Eighth Circuit has sustained a five-day suspension, imposed on the spot at the time of infraction, reduced later to three days for students who conferred privately with the principal. Tate v. Board of Education of Jonesboro, 453 F.2d 975 [8th Cir., 1972].

The District Court considered, as does Judge Rives, that the applicable suspension procedures are those for suspensions of more than three days, on the basis that the students already had been suspended, either instantaneously when they were told to leave the school grounds if they were not going to attend classes, or on Thursday and Friday when not permitted to return. This we must reject. The difference is much more than a semantic one over shades of meaning between "suspension," "exclusion," and "refusal to readmit." It goes to the roots of the principle that short of actions that rise to constitutional dimensions the primary place—and the best place—for handling matters of school order and discipline is within the institution and not in the courtroom.

■ We have described in detail the approach by which, before the walkout, school officials gave the black students full audience for their complaint. We have set out the means by which, after the walkout, the officials pursued several objectives: to de-fuse the situation, prevent further difficulty and restore the school to normal operation, all by use of a multi-stage "cooling off" period of two school days plus a weekend,[12] and, if they thought it appropriate, to arrange for and promptly commence disciplinary proceedings.[13] There may be varying opinions, concurrent and after the event, by school officials, judges, and parents black and white, of the best manner in which to meet the demands of this particular situation, the timetable to be employed, and the sequence to be followed, and many of the differing opinions may be entirely reasonable. But it is quite another thing to say that

12. While our decision does not rest solely thereon, we note the fires in the building on Wednesday and again on Thursday. None became a conflagration. We reject the treatment of them by plaintiffs' counsel as an inconsequential trifle. No fire in a building with 1700 young people in it is inconsequential. The small fire may quickly become a deadly inferno, and one moment's joke or gesture of defiance in the next moment may become panic. The school officials would have been guilty of shocking breach of duty had they cavalierly treated the risk of fire. In his speech to the assemblage at the gym, on Wednesday morning, Mr. Anderson urged the students to set no fires.

13. There were some departures from the broad outlines of the program and some difficulties in carrying it out. For example, one small group of whites left class on Wednesday to "see what was going on" and were allowed, after discussion with the principal, to return at the same period on Thursday and missed only one day of school. A few others who had been ill on Wednesday, or checked out by their parents, were allowed to return on Thursday. Also, when a student who had been absent without excuse on Wednesday sought readmission on Friday on the basis he was a nonparticipant, it was in the nature of the process easier for a white, since only blacks had been participants. These deviations and differences do not vitiate the general approach.

the school officials acted illegally, arbitrarily, or discriminatorily in making the choices which they made.[14] We reject the theory that in seeking the aims which we have described the school officials, by keeping out of school for two days those who had voluntarily and en masse absented themselves, imposed as a penalty an automatic suspension without hearing in violation of the school regulations and of the Constitution. What was said in the concurring opinion in Ferrell v. Dallas Independent School District, 392 F.2d 697, 704 (5th Cir. 1968), is peculiarly appropriate to this case:

> Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly. At the same time we expect that the requirements of order, and of protection and implementation of the educational program of the school, will be met by limited enforcement means—the force of the school establishment itself and the school-related disciplines of reprimand, suspension, and expulsion—recognizing that the schoolroom is an inappropriate place for the policeman to be either called or needed.

A school may not stifle dissent because the subject matter is out of favor. Free expression is itself a vital part of the educational process. But . . . the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems. . . .

While keeping our doors open for the vindication of the rights of all citizens, we have recognized the value of pursuit within the institution of means provided for handling the abrasions and adjustments both of school integration and of student conduct, e. g., Stevenson v. Board of Ed. of Wheeler County, 426 F. 2d 1154 (5th Cir. 1970); Lucas v. Chapman, 430 F.2d 945 (5th Cir. 1970). Consistent with that approach, to the extent that in the interview procedure penalties greater than three-day suspensions were being imposed, an appropriate remedy would have been to direct the school to proceed within allowable limits rather than to require immediate readmission of all students and take out of the hands of school officials the right to investigate and to take disciplinary action.

### 5. Remedy

The order of the District Court already has remedied the improper actions of the school officials in imposing penalties greater than three-day suspensions and in requiring students to sign the forms.

In other respects the conclusion which we have reached requires reversal, which we direct. However, because of the peculiar circumstances, we reinstate in

---

14. Obviously, there also may be differing opinions about whether school officials should have done something more, or less, or different, to ameliorate black students who felt themselves aggrieved and their aroused parents as well. But these are not constitutional questions. We do not imply that the blacks' sense of grievance was not deeply felt or genuine, or that they were wrong in expressing it to school officials, so long as done by appropriate means. On the other hand, fairness to the school officials requires pointing out that in the integration process the use of approximate racial ratios has been not only allowed and encouraged but at times required by the courts in many areas of school life. Thus we reject the contention that both the ratio and the form of the ballot were illegal and arbitrary, and that these pre-walkout usages by school officials imparted color of illegality to their postwalkout actions.

In this connection, we note this evidence. Each cheerleader incurred personal expense for a year of approximately $200. To assure that blacks not be foreclosed by this expense, Principal Hanna arranged for 1970–71 that it be paid for the black cheerleaders out of funds under his direct or indirect control. After receiving criticism for this, he and other school officials arranged for like payments for 1971–72 by contributions solicited by them from sources outside the school.

part the order of the District Court thus reversed, though for reasons different from those for which it was entered. A year has passed. The students are back in school or have graduated. There have been no further problems, and the cheerleader dispute is at rest. We can perceive little, if any, purpose to be attained by interview procedures being commenced again for those who are still in school and did not submit a year ago, and, no doubt, to do so would reopen wounds at least partially healed. Presumably some of the participants have graduated without adverse notations on their records. Under the circumstances it would be an injustice to single out for adverse effect, by reentry on their records of notations removed by the District Court's order, only one group composed of those who are still in school and who submitted to interviews and who received valid suspensions. Therefore, we reinstate the order of the District Court insofar as it directed that notations of disciplinary action be removed from student records and that no further disciplinary or readmission procedures take place.

Affirmed in part, reversed in part. Order of District Court reinstated in part for different reasons.

RIVES, Circuit Judge, dissenting:

Except insofar as the judgment of the district court is affirmed, I respectfully dissent. It is my opinion that this Court should not find fault with the district court's approach to or disposition of this case. I think that the judgment of the district court should be affirmed and that the affirmance could well be based upon the judge's able opinion and order published in 327 F.Supp. 528–534. The district judge faced a live controversy in which racial strife might be either aggravated or lessened. Two hundred fifty to three hundred black pupils had been "excluded" from attending high school from Wednesday, March 24, to Tuesday, March 30, more than three full school days, and most of them remained indefinitely so "excluded." Judge Justice acted promptly and firmly to order their re-admittance and to forbid their further punishment. Admittedly, there have been no "problems because of the cheerleader walkout since the students returned." (App. 206). That seems to me a strong indication of the wisdom of the district judge's order. He had lived with the friction between blacks and whites for some seven months since he had been attempting to establish a unitary school system, and to that end had ordered the previously all-black high school closed. Before acting in the present controversy, he conducted a full and fair hearing and was in far better position at that time to pass judgment than are we appellate judges a year later. It was within his sound judicial discretion to grant the plaintiffs' application for preliminary injunction, and, in my opinion, the circumstances are not such as to impel us to the conclusion that he abused his discretion.[1]

I think that the district court's findings of fact[2] are certainly not clearly erroneous. Evidently the majority does not agree, for it spends several pages in restating the facts. The net result of that restatement, with the exception of a gloss of sympathetic understanding toward the school authorities, is one minuscule correction of the district court's findings.[3] To my way of thinking even that correction becomes immaterial when the time of "exclusion" awaiting interview is properly considered as a period of "punishment." See my footnote 7, *infra*. Any further discussion of the facts in this dissenting opinion would be of no precedential value, and I therefore proceed directly to a discussion of some of the principles of law.

Since the school officials relied upon the applicable written regulation quoted

1. See Burnside v. Byars, 5 Cir. 1968, 363 F.2d 744, 749.

2. 327 F.Supp. 530, 531, 532.

3. See footnote 4 of the majority opinion and its accompanying text.

148

in footnote 6 to the majority opinion, there would seem to be no occasion for this Court to decide whether such a regulation was essential. Nonetheless the majority devotes a long paragraph to that subject and concludes: "Thus, wholly apart from the regulation, the school was authorized to act with regard to a mass refusal to attend classes." I do not agree.

Confining the discussion to what is here involved, that is to a walkout and absence of one day, for which the penalty imposed is suspension plus probation on condition that " \* \* \* if I violate any school order after this date, I will be subject to permanent expulsion for the remainder of the school year," the punishment is too severe to be justified on any concept of inherent authority vested in the school officials. I think that the district judge had the better view when he said: "Precision of regulation is essential since the state may regulate in this area only with narrow specificity, NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)." 327 F.Supp. 533, approved in Gooding v. Wilson, 404 U.S. ——, 92 S. Ct. 1103, 31 L.Ed.2d 408, decided Mar. 23, 1972. Professor Wright takes the position that specific rules are desirable and that they may be constitutionally required in cases like this of speech oriented conduct (see 22 Vanderbilt L.Rev. 1064–1067), and further that, "For these reasons, I think it no overstatement to say that the single most important principle in applying the Constitution on the campus should be that discipline cannot be administered on the basis of vague and imprecise rules." (p. 1065). No rule at all is certainly the ultimate in vagueness and imprecision. In the context of school authorities' attempting to regulate speech related activities, we should not fault the district judge for his approach in terms of the written regulation and its validity *vel non*. I agree with his carefully reasoned opinion (see 327 F.Supp. at 532–535) that the pertinent regulation suffers from the defects both of vagueness and of being overbroad.

More clearly, however, there was a total failure to comply with the school's own regulations governing suspensions. Indeed the majority so concedes "to the extent that they imposed penalties greater than three-day suspensions":

"The school officials considered that they were acting under the procedure for suspensions of three days or less, and, to the extent that they imposed penalties greater than three-day suspensions, we agree with the District Court that the regulations were not followed. Thus it was not proper to impose probation or the exposure to future permanent expulsion for violation of any other school rule."

Majority opinion p. 144. In every case of a student absent because of the walkout, the penalty imposed at the end of the required interview was greater than a three-day suspension because every such student and his or her parent or guardian were required to sign the following form:

"JOHN TYLER HIGH SCHOOL

"Date: ——————————

"I, ——————, upon being readmitted to
    Student

John Tyler High School, understand and agree that I am on probation. Therefore, if I violate any school rules after this date, I will be subject to permanent expulsion for the remainder of the school year.

——————————————
Student's Signature

——————————————
Parent or Guardian's Signature

——————————————
Principal"
(App. 586, and 145, 146.)

Thus, potentially the probation could be more severe than the added three days' suspension. Nor can we be oblivious to the fact that the suspended and probated

students might suffer "collateral consequences."

"One specific example of such consequences would be the increased difficulty in obtaining admission to a college or university that these students might well encounter. The severe disciplinary action taken against these students amounts to a blot on their scholastic records that might well haunt them for years to come."

Sullivan v. Houston Independent School District, S.D.Tex.1969, 307 F.Supp. 1328, 1338.

In attempting to validate the procedure employed by defendants in disciplining the plaintiffs, the majority opines that the amount of formal due process required varies according to the degree of severity of the punishment to be imposed. I would agree in theory.[5]

The majority finds that the procedure actually employed in this case was sufficient where only a three-day suspension is involved. It seems to me that such a finding is at best dictum and at worst an advisory opinion. Of those students who submitted to the interview process, all who were found to have been participants in the walkout were given a sentence harsher than a three-day suspension. They had already missed three days of classes, thus bringing the total length of exclusion to six days. Moreover, they were subjected to the additional penalty of probation for the remainder of the school year.

As to those who refused an interview, they were in no way apprised of the maximum penalty to which they were exposed. Arguably, they could have been expelled. And upon refusing to submit to the interview process, they were in reality excluded for an indefinite period. In this light, I submit that

the procedural rights actually provided by the defendants were not sufficient.

Finally, the majority justifies the defendants' action at least partially on the ground that it was necessary in light of the fires set in and about the school. But, the school officials themselves did not seek approval of their acts on such a basis. There was no evidence to connect the plaintiffs with any fires. At most the fires may be considered as background. The charges preferred by radio announcement (App. pp. 141, 142) were themselves vague, but no one has contended that they included any responsibility for the fires.

The majority concedes that the action of the school authorities in imposing penalties greater than three-day suspensions cannot be justified, but holds that error to be remedied by the action of the district court which resulted in remitting the excessive part of the penalty. Under a like process of reasoning, a sentence in excess of that permitted by statute can be cured by reducing it to the statutory maximum. To me that seems strange law. I had thought that the sentence would have to be vacated in toto.

In the concluding part of its opinion, captioned "Remedy," the majority either affirms outright or reinstates for reasons different from those entertained by the district court nearly all of the actual *decision* of the district court. It is not at all clear to me what further action is required by the reversal in part. The majority opinion and decision amount to little more than a criticism of the reasoning of the district court. In so doing it announces principles of law which would, in my opinion, furnish erroneous precedents. The main purpose of this dissent is to discuss those legal principles.

---

5. I recognize the correctness of the approach of the Second Circuit in assuming arguendo "that due process applies when a publicly financed educational institution—whether college or high school—imposes a mild, as well as a severe, penalty upon a student," but that, "We believe

that in these school discipline cases the nature of the sanction affects the validity of the procedure used in imposing it." Farrell v. Joel, 1971, 437 F.2d 160, 162. See also Wright, 22 Vand.L.Rev. 1060–1062.

In its footnote 9, the majority sets out the school regulations governing suspension of students for *three days or less*. Later it concludes that

"The suspensions did not violate the governing regulation set out in footnote 9, supra,[11] and the regulations are constitutionally sufficient."

[11] In fact, there was more than compliance. Rather than school officials imposing the penalty, telling the parent later, and then having an interview, the parents were brought into the picture from the beginning.

Majority opinion at p. 144. I do not agree for two reasons. First, the applicable regulations should be those governing punishment of more than three days' suspension.[6] As has been demonstrated, every walkout student who submitted to the required interview was punished[7] by exclusion and/or suspension combined for more than three days, plus also probation for the remainder of the school term. The majority concedes that for greater punishment than suspension for three days the more formalized procedure is necessary to meet due process requirements.[8]

Second, conceding arguendo that the applicable regulations are those governing punishment by suspension of *three days or less*, the interview procedure did violate even those regulations in several particulars. There was inadequate notice of the charges, no notice whatever of the maximum penalty to be imposed, or of what consequences could ensue from the interview, and an inadequate hearing largely confined to the student's responses to a pre-arranged set of inquiries. The interview procedure did not afford the students the bare rudiments of due process. For those students who refused to submit, the "exclusion" was indefinite and "continued until these students and their parents sub-mitted to the interview procedure." 327 F.Supp. at 532. From such a deprivation of procedural due process, I respectfully but vigorously dissent.

ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

Before RIVES, AINSWORTH and GODBOLD, Circuit Judges.

PER CURIAM:

The Petition for Rehearing is denied and the Court having been polled at the request of one of the members of the Court and a majority of the Circuit Judges who are in regular active service not having voted in favor of it, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is also denied.

RIVES, Circuit Judge: I dissent from the denial of the rehearing by the panel.

---

6. The regulations governing both the minor and the major punishments are set forth in footnote 2 to the district court's opinion. See 327 F.Supp. at 531, 532.

7. Surely the district judge could accept the opinion of Mr. Hanna that students being "excluded" awaiting interview "were out of school, and because they were missing a chance to learn, it would be punishment in my opinion." (App. 148.)

8. See footnote 10 and accompanying text of majority opinion.